# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **INTERCONTINENTAL TERMINALS CORPORATION, LLC**<br>Plaintiff, | §<br>§<br>§<br>§ | |
| v. | §<br>§ | **C.A. NO. 4:18-cv-3113**<br>**RULE 9(h) - ADMIRALTY** |
| **AFRAMAX RIVER MARINE CO., EXECUTIVE SHIP MANAGEMENT PTE LTD., M/T AFRAMAX RIVER**<br>Defendants / Third-Party Plaintiffs, | §<br>§<br>§<br>§<br>§ | |
| v. | §<br>§ | |
| **SUDERMAN & YOUNG TOWING COMPANY, G&H TOWING COMPANY And SEABULK TOWING SERVICES, INC.**<br>Third-Party Defendants. | §<br>§<br>§<br>§<br>§ | |

## TUG INTERESTS' BRIEF REGARDING DISCOVERY DISPUTE

**TABLE OF CONTENTS**

1. INTRODUCTION …………………………………………………………………1

    **A.** The Basic Facts ……………………………………………………………1

    **B.** The Discovery Timeframe that ARM Wants the Court to Ignore ……………….2

2. ARGUMENT ……………………………………………………………………3

    **A.** The Applicable Legal Standards ……………………………………………3

    **B.** ARM Was Aware of the Post-Incident Winch Failure Aboard the JESS NEWTON for over 1 ½ Years during Discovery, but It Simply Chose Not To Explore That Event During Discovery; It Can't Do So Now …………..………...5

    **C.** ARM Grossly Distorts the Discovery "Supplementation" Requirement of Fed. R. Civ. P. 26(e) to Belatedly Revisit Tug Interests' Prior Objections to ARM's Discovery Requests …………………………………………………………7

    **D.** ARM's Complaints Regarding Tug Interests' 10/26/20 Discovery Responses are a Problem of Its Own Making in Waiting to Issue Comprehensive Discovery Until the End of the Discovery Deadline …………………………………….8

    **E.** ARM failed to issue a Notice of Tug Interests' Rule 30(b)(6) Deposition or Topics for Inquiry ………………..………………………………………………..8

    **F.** ARM's Additional Expert Reports Should be Struck ……………………………9

        **i.** The Initial Expert Report Submissions ………..………………….9

        **ii.** The Improper "Supplemental" Reports of ARM Tug Expert Michail Chourdakis and Navigation Expert Douglas Torborg………10

        **iii.** The Sandbagging Must End …………………………………11

3. CONCLUSION ……………………………………………………………….12

1. **INTRODUCTION**

As ordered by the Hon. Magistrate Judge Christina Bryan on 3/18/21, Third-Party Defendants Suderman & Young Towing and G&H Towing (collectively "**Tug Interests**") submit this brief opposing Third-Party Plaintiffs Aframax River Marine Co. and Executive Ship Management PTE Ltd.'s ("**ARM**") belated attempt to reopen discovery. No further discovery (with exception of expert depositions) should be allowed, and the Court should also strike certain untimely rebuttal reports recently issued by ARM experts Michail Chourdakis and Douglas Torborg. Tug Interests note the following:

A. **The Basic Facts**

This lawsuit arises out of a maritime casualty involving ARM's vessel AFRAMAX RIVER ("AFRAMAX"). Shortly before midnight on 9/5/16, the AFRAMAX was moored at a berth in the Houston Ship Channel and preparing to depart. Houston Harbor Pilot Michael McGee boarded the AFRAMAX to assist her master Arvind Kumar in departing the berth. Two Tug Interest tugboats - the GASPARILLA (under the command of Captain Doug Scott) and JESS NEWTON (under the command of Mate Charles Arduengo) - were ordered by the AFRAMAX to assist with the departure maneuver, wherein the AFRAMAX would use her massive engine at *dead slow astern* to move backwards into the channel, during which time the tugs would follow the Pilot's orders to turn AFRAMAX clockwise in the channel for her outbound departure.

At around 0001 on 9/6/16, the AFRAMAX began her *dead-slow-astern* departure into the channel; the GASPARILLA was connected via towline to her port bow, and the JESS NEWTON connected via towline on her port stern. However, the AFRAMAX's engine governor malfunctioned at the start of the evolution, which caused her engine to unintentionally shift into *full-speed-astern*. The AFRAMAX's runaway astern engine could not be corrected by her crew,

1

and she crossed the channel and allided with two mooring dolphins, resulting in a large explosion and damages to the dolphins and AFRAMAX. The owner of the dolphins (ITC) sued ARM, who in turn sued Tug Interests, disingenuously ignoring the documented engine malfunction and claiming that *Tug Interests* caused the incident in allegedly failing to "properly turn" the AFRAMAX. Tug Interests deny this assertion – it is clear that the sole cause of this allision was AFRAMAX's runaway engine. The case is that simple.

### B. The Discovery Timeframe that ARM Wants the Court to Ignore

Tug Interests were sued by ARM on 2/28/19, and discovery began in earnest on **4/8/19** when Tug Interests submitted their Rule 26 Initial Disclosures. The discovery period was then extended *four* times over 1 ½ years up to 11/1/20 so the parties could evaluate their legal positions (if they wished).[1] Tug Interests timely responded to ARM's discovery requests during this timeframe, and objected to certain requests as noted in more detail below. At no time did ARM seek a Rule 37 conference or file a motion to compel concerning Tug Interests' discovery responses. As the case approached the 11/1/20 deadline, Tug Interests began preparing for trial.

ARM retained its *third* counsel of record on 10/26/20 (i.e., 6 days before the discovery deadline). Aside from a limited set of remaining expert depositions, discovery was over. Indeed, at the Court conference before Judge Miller on 12/2/20, ARM attempted to obtain a 6th discovery extension, arguing that they were "still evaluating" the discovery file. Judge Miller denied that request, generally commenting that ARM's new counsel inherited the history of the case.

Thereafter, on 2/1/21 it was discovered that Tug Interests had inadvertently failed to produce a single two-paged incident report to ARM regarding a winch malfunction that had

---

[1] See Docket Control Orders at Dkts. 39, 43, 45, and 54.

occurred aboard the tug JESS NEWTON *after* the 9/6/16 allision (the "JN Winch Report").[2] After being alerted to this issue, the JN Winch Report was immediately produced the next day to ARM's counsel.

ARM believes the JN Winch Report is a "smoking gun," but in reality, ARM had been aware of the JESS NEWTON winch failure since **4/8/19**, when it was referenced in over five documents that were first produced to ARM as part of G&H's Rule 26 Initial Disclosures. Presumably, ARM's prior counsel saw those documents and that "event" for what it is – a non-issue that clearly occurred *after* the allision which had nothing to do with the events *leading up to* the allision.

Now sensing an opportunity, ARM's third counsel is using the two-paged JN Winch Report as an excuse to **(a)** revamp ARM's entire theory of the case and **(b)** belatedly alter ARM's prior discovery strategy over the past 1 ½ years. They are also using the JN Winch Report as vehicle to issue untimely "supplemental" expert reports on opinions that could have been issued long ago in accordance with the Court's DCOs – but were not. These attempts are improper.

2. **ARGUMENT**

   A. **The Applicable Legal Standards**

Scheduling orders may be modified only for "good cause." Fed. R. Civ. P. 16(b)(4). "The good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003). This diligence requirement is critical. *See* Fed. R. Civ. P. 16 advisory committee's note (1983). However, lawyer deficiency is not a reason

---

[2] As noted to the Court in Tug Interests' 2/12/21 correspondence, the JN Winch Report was stapled to a witness statement and unintentionally not scanned into undersigned counsel's electronic document database.

to relax due diligence. *Superior Diving Co. Inc. v. Cortigene*, 372 F. App'x 496, 497 (5th Cir. 2010) (per curiam). "[T]he client is responsible for choosing his lawyer and cannot claim inadequacies as an excuse for failing to meet deadlines and duties imposed by law." *Id.*

Beyond diligence, "[i]n the context of an untimely motion to submit expert reports, designate experts, or amend the pleadings, the Fifth Circuit Court of Appeals applies a four-factor balancing test to determine whether good cause exists: (1) the explanation for the failure to adhere to the deadline at issue; (2) the importance of the proposed modification to the scheduling order; (3) potential prejudice; and (4) the availability of a continuance to cure such prejudice." *Hernandez v. Mario's Auto Sales, Inc.*, 617 F. Supp. 2d 488, 493 (S.D. Tex. 2009) (Hacker, Mag. J.) (citing *Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997) (submitting expert reports); *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990) (designating expert witnesses); *S & W Enters.*, 315 F.3d at 536 (amending pleadings)). "At least one district court in the Southern District of Texas has also utilized this test in the context of a motion to reopen discovery." *Hernandez*, 617 F. Supp. 2d at 493 (citing *United States v. McFerrin*, No. H-05-3730, 2007 WL 4353709, at *1 (S.D. Tex. Dec. 11, 2007) (Atlas, J.).

In sum, a scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985). "We live in a world of deadlines. If we're late for the start of the game or the movie, or late for the departure of the plane or the train, things go forward without us. The practice of law is no exception." *Spears v. City of Indianapolis*, 74 F.3d 153, 157 (7th Cir. 1996).

4

**B. ARM Was Aware of the Post-Incident Winch Failure Aboard the JESS NEWTON for over 1 ½ Years during Discovery, but It Simply Chose Not To Explore That Event During Discovery; It Can't Do So Now**

Tug Interests produced numerous documents at the beginning of the case which confirmed that a winch malfunction occurred aboard the JESS NEWTON as it was backing away from the fire that ignited *after* the AFRAMAX allied with the mooring dolphins at issue. These documents totally undercut ARM's position that the winch issue aboard that tug was only "recently discovered" and otherwise that the scheduling order should be extended again (for a 7th time). For example, on 4/8/19 (1 year and 7 months before the applicable discovery deadline of 11/1/20), Tug Interests produced:

- A 9/5/16 "Daily Log" for the JESS NEWTON, which indicates that she assisted the vessels GASCHEM HUNTE, EAGLE SYDNEY, STOLT VIRTUE, and BRYANT *before* the AFRAMAX RIVER; no issues were reported for these jobs, which by inference confirms her winch was working.[3]

- A 9/6/16 witness statement from JESS NEWTON Captain William Curry issued shortly after the AFRAMAX incident that day. The Curry statement expressly notes that after the AFRAMAX RIVER allision occurred, "*[t]he fuel ignited and the ship Aframax River was engulfed in flames. The Mate Charles Arduengo was at the helm, I advised the mate to spool out our hawser line and back away from the ship. The hawser line for the Jess Newton burned into and fell in the water. While reeling the hawser line back aboard the vessel **the working winch blew a seal and stopped working**......*"[4]

- A 9/6/16 witness statement from JESS NEWTON Mate Charles Arduengo issued shortly after the AFRAMAX incident that day. The statement clearly notes that the tug was able to maintain a "*taught line*" leading up to the allision and that after the AFRAMAX RIVER allision occurred, "*[w]hile I was paying out the hawser the fire burned through the line. The hawser was then retrieved with the winch but was operating slowly. The engineer went into the engine room and upon further inspection observed an O ring ruptured in the winch hydraulics causing hydraulic oil to spray in all directions.*"[5]

---

[3] See Exhibit "A." To avoid confusion with existing bates numbers, please see red pgs. **002-004**.
[4] See Ex. "A," red pg. **006**, with emphasis added.
[5] See Ex. "A," red pg. **007**.

5

148906.06501/125516743v.1

- A 9/6/16 witness statement from JESS NEWTON Wiper Michael Linzenmeyer issued shortly after the AFRAMAX incident that day, noting that he went to the engine room and observed hydraulic fluid.[6]

- A 9/6/16 "Daily Log" for the JESS NEWTON generated after the allision that day, which clearly shows a "*Mechanical / Structural Failure*" occurring aboard the tug at 0012 hours (unquestionably after the allision, which occurred a few minutes earlier).[7]

Notably, on 5/20/19, <u>ARM</u> separately produced documents to ITC and Tug Interests. Included within that production was a record statement of JESS NEWTON Mate Arduengo obtained by United States Coast Guard and National Transportation Safety Board investigators on 9/9/16; Mate Arduengo addressed the winch issue in that statement, and it is clear from his observations that the winch breakdown occurred *after* the incident.[8] ARM's second counsel could have but did not question Mate Arduengo on any of the above during his 6/23/20 deposition.

As outlined above, Tug Interests inadvertently produced the JN Winch Report to ARM on 2/2/21, but there is nothing in that report that changes any of the expansive amount of information above that was already in ARM's possession during the lengthy discovery period.[9] Indeed, the JN Winch Report expressly notes that the JESS NEWTON's "maneuverability" was **not** impaired as a result of the winch issue.[10] Under the circumstances, the current winch theory being proffered by ARM's third counsel is a giant, untimely red herring, and discovery should not be reopened here.

---

[6] See Ex. "A," red pg. **008**.
[7] See Ex. "A," red pg. **010**.
[8] See Ex. "A," red pgs. **013-015**.
[9] See Ex. "A," red pgs. **017-018**.
[10] See Ex. "A," red pg. **017.**

### C. ARM Grossly Distorts the Discovery "Supplementation" Requirement of Fed. R. Civ. P. 26(e) to Belatedly Revisit Tug Interests' Prior Objections to ARM's Discovery Requests

ARM's third counsel wants to otherwise turn back time to demand that Tug Interests "supplement" their 7/29/19 and 10/26/20 responses to ARM's discovery requests. However, it is improper for ARM to characterize this as a supplementation issue under Fed. R. Civ. P. 26(e), which requires supplementation if a party learns that a prior response is "incomplete" or "incorrect." Tug Interests' responses are neither.

In reality, ARM's third counsel carefully side-steps the more glaring issue here: during the 1 ½ years of discovery, Tug Interests timely objected to certain of ARM's prior discovery requests as being overly broad, unduly burdensome, or otherwise exceeding the scope of relevant information. But ARM did nothing. ARM failed to request a requisite Rule 37 meet-and-confer conference during the discovery period to discuss Tug Interests' allegedly-defective responses – a critical point conceded by ARM's third counsel during the 3/14/20 conference with the Court. ARM's current demand that Tug Interests provide additional responses must fail on that point alone. Moreover, if ARM's legal position on "supplementation" was sound, then any party could neutralize an opponent's valid and continuing discovery response objections by simply waiting until discovery expires, and then demanding that the opposing party "supplement" its prior responses via Rule 26(e). This vitiates the entire purpose of submitting objections to discovery. That can't be the rule, and under the circumstances, this Court should reject ARM's 11th hour invitation to void all of Tug Interests' unchallenged objections to ARM's prior discovery requests.

148906.06501/125516743v.1

### D. ARM's Complaints Regarding Tug Interests' 10/26/2020 Discovery Responses are a Problem of Its Own Making in Waiting to Issue Comprehensive Discovery Until the End of the Discovery Deadline

ARM also complains that Tug Interests belatedly produced additional documents to it "*on the eve of the discovery deadline,*" particularly with respect to the operational status of the winch aboard the GASPARILLA. But that complaint rises to the level of chutzpah; <u>ARM</u> waited until 9/21/20 to issue a second set of discovery requests to <u>Tug Interests</u>, which made Tug Interests' responses due only nine days before the discovery deadline.[11] ARM therefore has it backwards; it was ARM – not Tug Interests – that chose to issue expansive discovery on the eve of the applicable deadline (which itself had been extended four times by this point). Tug Interests timely responded to ARM's second discovery requests, with additional appropriate and unchallenged objections.[12] Under the circumstances, ARM should not be allowed to reopen discovery to address what it believes (wrongfully) are additional issues in need of further exploration.

### E. ARM failed to issue a Notice of Tug Interests' Rule 30(b)(6) Deposition or Topics for Inquiry

As an additional measure of bootstrapping, ARM uses all of the abovementioned arguments to reignite a belated request to obtain the 30(b)(6) deposition of a G&H representative. This request is also improper.

G&H representatives could have been available for corporate depositions if necessary during the 1 ½ years of discovery authorized by the Court. Notably, on 9/21/20 (i.e., almost one

---

[11] Tug Interests' response deadline was later extended to 10/26/20 per agreement with ARM's second counsel.

[12] For the sake of good order, Tug Interests note that the 10/26/19 discovery responses reveal that the GASPARILLA's winch was out of service on the date of the allision. However, the Tug handled five towing jobs in the 24 hours before the allision without issue, as confirmed by Tug Interests' 4/8/19 Initial Disclosures. See Ex. "A," red pgs. **019-021**. Moreover, GASPARILLA Capt. Scott was also interviewed by USCG-NTSB investigators and later testified that he followed all orders of Houston Pilot McGee. Simply put, the GASPARILLA's winch is also a red herring that could have been but was not explored by ARM's prior counsel.

8

month before the 11/1/20 discovery deadline), ARM's second counsel said they would be "noticing" Tug Interests' corporate deposition. That day, Tug Interests confirmed they would coordinate such events once ARM issued the necessary topics of inquiry so that appropriate corporate deponents could be identified. But no notice was ever issued by ARM… no topics were provided. Indeed, during a subsequent communication between counsel on 10/12/20, Tug Interests reminded ARM that they were waiting on the topics. No notice ever issued; no topics were provided. Two weeks later, ARM retained third counsel of record. There was never any discussion or agreement that ARM had some form of open-ended opportunity to take Tug Interests' corporate deposition. Undersigned counsel recalls that this was specifically discussed during the 12/2/20 conference with Judge Miller, and that he prohibited the 30(b)(6) deposition of Tug Interests given the timeline at issue. That ruling should stand.

### F. ARM's Additional Expert Reports Should be Struck

Over the past two months, ARM has submitted two expert reports far beyond the expert disclosure deadline. But supplemental disclosures "are not intended to provide an extension of the expert designation and report production deadline." *Metro Ford Truck Sales, Inc. v Ford Motor Co.*, 145 F. 3d 320, 324 (5th Cir. 1998). Putting aside the fact that ARM did not seek leave of court at any time to submit the expert reports at issue, the reports themselves are *per se* improper.

#### i. The Initial Expert Report Submissions

On 7/17/20, ARM first submitted the expert reports of their tug expert Michail Chourdakis and navigation expert Douglas Torborg. On 8/19/20, Tug Interests submitted the expert reports of hydrodynamic expert Charles Munsch and navigation expert Gregory Nichols. In response, on 9/18/20 ARM submitted a single rebuttal report from Chourdakis. These reports are all proper and timely submitted within the applicable expert disclosure deadlines, which per Dkt. 54 was 9/2/20,

9

(with an additional 30 days for ARM's filing of rebuttal reports per Fed. R. Civ. P. 26(a)(2)(D)(ii)). On 1/5/21, Judge Miller issued an order that no further discovery was permitted in the case.

### ii. The Improper "Supplemental" Reports of ARM Tug Expert Michail Chourdakis and Navigation Expert Douglas Torborg

Ignoring Judge Miller's directive, on 1/12/21 ARM issued an "addendum" to Chourdakis' 9/18/20 rebuttal report ("Chourdakis Addendum 1"). ARM claimed Chourdakis Addendum 1 was necessary so that he could address Tug Interests' 10/26/20 discovery responses. However, Chourdakis Addendum 1 expanded his earlier 9/18/20 comments on the Tugs' arrangements and connections points and the planned maneuver; he then added a small section on the JESS NEWTON's alleged winch problems. Under the circumstances, Chourdakis' 1/14/21 deposition was cancelled (along with all other expert depositions) to address his surprise addendum. Putting aside the untimeliness violations here, Tug Interests were willing to question Chourdakis on Addendum 1. The expert depositions were then rescheduled to mid-February 2021.

Incredibly, on 2/11/21 ARM submitted *another* Chourdakis addendum report ("Chourdakis Addendum 2"). Chourdakis Addendum 2 expanded upon his 9/18/20 comments and Addendum 1 comments regarding the Tugs' connection points, proffered a new opinion on the Tugs' actions and effectiveness, issued additional opinions regarding the JESS NEWTON's winch, a new opinion on the GASPARILLA's winch, additional opinions on the speed of the AFRAMAX, and new conclusory opinions. All of these opinions are either expansions of his earlier conclusions or new untimely opinions issued far beyond the deadline.

As noted above, Torborg was not designated as a rebuttal expert. In any event, on 2/12/21 he issued a "supplemental" report purportedly after "[h]aving received new documentation." Putting aside the fact that ARM did not seek leave of court to submit such a report, Torborg's

commentary is misleading. In his 2/12/21 report, Torborg opined on documents that had been available to ARM since 4/18/19 *before* the issuance of his 7/17/20 initial expert report. He went on to opine on other documents that had been produced by Tug Interests on 10/26/20; a point which has been extensively addressed by Tug Interests above. Torborg also provided limited commentary on the JN Winch Report; but as outlined above that document is duplicative of numerous items that Torborg could have commented on earlier in the case. In short, Torborg's supplemental 2/12/21 report – submitted far after the appropriate rebuttal deadline of 9/18/20 – should be struck.[13]

### iii. The Sandbagging Must End

As the Court aptly noted in *United States ex rel Brown v Celgene Corp.,* 2016 WL 6562065, *4 (C.D. Ca Aug. 23, 2016)(internal citations omitted):

> Supplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a "supplement." Although Rule 26(e) obliges a party to "supplement and correct" its disclosures upon information later acquired, this "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witnesses' report (indeed, the lawsuit from the outset). To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports…" Enabling this pattern of behavior "would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines." Accordingly, a supplemental expert report that states additional opinions or "seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report" is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c).

---

[13] It is also clearly apparent from this timeline that ARM took advantage of the January 2021 expert deposition cancellations it caused by the submission of Chourdakis Addendum 1 Report; if that report had never been made, the depositions would have gone forward in January, and presumably Torborg would have never issued his 2/21/21 report.

That is precisely what has occurred here. ARM has improperly attempted to refine and expand the expert reports of Chourdakis and Torborg far beyond the applicable deadline, and the alleged reasons that they offer for this necessity have no support, particularly given the timeline of Tug Interests' productions. These tactics have greatly prejudiced Tug Interests; they were backed into a corner and forced to twice cancel all expert depositions because of the tactically-produced supplemental reports. This type of discovery abuse must end now.

3. **CONCLUSION**

For the reasons noted above, Tug Interests request that:

- No further substantive discovery be permitted in the case, aside from the taking of all remaining expert depositions;

- The 2/11/21 Supplemental Expert Report of ARM tug expert Michail Chourdakis be struck in its entirety;

- The 2/12/21 Supplemental Expert Report of ARM navigation expert Douglas Torborg be struck in its entirety;

- ARM's experts be expressly precluded from issuing any further supplemental reports in this matter.

148906.06501/125516743v.1

Houston, Texas
March 22, 2021

Respectfully Submitted,

**BLANK ROME LLP**

*/s/ Jeremy A. Herschaft*
Jeremy A. Herschaft (Attorney-In-Charge)
Texas State Bar No. 24091970
Federal I.D. No. 2450990
Michael K. Bell
Texas State Bar No. 02081200
Federal I.D. No. 5085
717 Texas Avenue, Suite 1400
Houston, TX 77002
Telephone: 713.228.6601
Facsimile: 713.228.6605
Email: jherschaft@blankrome.com
Email: mbell@blankrome.com

*Attorneys for Third-Party Defendants Suderman & Young Towing Company and G&H Towing Company*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2021, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will forward a copy of the document to all counsel of record.

*/s/ Jeremy A. Herschaft*
Jeremy A. Herschaft

148906.06501/125516743v.1