**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **INTERCONTINENTAL TERMINALS CORPORATION, LLC** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **C.A. NO. 4:18-cv-3113** |
| **v.** | § | **RULE 9(h) - ADMIRALTY** |
| | § | |
| **AFRAMAX RIVER MARINE CO.,** | § | |
| **EXECUTIVE SHIP MANAGEMENT PTE** | § | |
| **LTD., M/T AFRAMAX RIVER** | § | |
| **Defendants / Third-Party Plaintiffs,** | § | |
| | § | |
| **SUDERMAN & YOUNG TOWING** | § | |
| **COMPANY, G&H TOWING COMPANY** | § | |
| **And SEABULK TOWING SERVICES,** | § | |
| **INC.** | § | |
| **Third-Party Defendants.** | § | |

**SUDERMAN & YOUNG TOWING COMPANY'S AND G&H TOWING COMPANY'S
PRE-TRIAL PROPOSED CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

**Page**

PRE- TRIAL PROPOSED CONCLUSIONS OF LAW ....................................................1

I.     JURISDICTION AND VENUE ...........................................................................1

II.    GOVERNING LAW..............................................................................................1

III.   LEGAL STANDARDS .........................................................................................1

     A.    General Maritime Law Principles Regarding Unseaworthiness...............................1

     B.    General Maritime Law Principles Regarding Negligence ........................................3

     C.    The *Oregon* Rule........................................................................................................5

     D.    The *Pennsylvania* Rule and the U.S. Inland Navigation Rules .............................6

     E.    The *In Extremis* Doctrine ..........................................................................................9

IV.   ANALYSIS............................................................................................................9

     A.    The Governor System Components were Discarded by ARM, which Results in an Inference that it Was Not In A Good Condition During the Entire Departure Evolution....................................................................................................10

     B.    The AFRAMAX's Governor System was Unseaworthy and Its Malfunction was a Proximate Cause of the Allision ...................................................................14

     C.    The AFRAMAX Violated Rules 6, 7, 8 and 2, Which Were All Proximate and Contributing Causes to the Allision ...............................................................21

           i      The AFRAMAX Violated the Rule 6 Governing Safe Speed ..................21

           ii     The AFRAMAX Violated Rule 7 When Her Crew Failed to Determine that a Risk of Allision Existed as She Over-sped Across the Channel and Approached the ITC Dolphins and Ships Berthed at ITC / Vopak ....................................................................................24

           iii    The AFRAMAX Violated Rule 8 by Failing to Timely Take Action to Avoid Allision.................................................................................27

           iv    The AFRAMAX Crew failed to demonstrate Good Seamanship in Violation of Rule 2.......................................................................29

     D.    The Actions of the Assist Tugs GASPARILLA and JESS NEWTON Did Not Cause or Contribute to the Allision ...............................................................30

           i      The Tug Crews Were Properly Trained and They Followed All of the Pilot's Orders ............................................................................30

           ii     The Tugs' Winches Played No Part in Causing the Allision....................35

           iii    The AFRAMAX Significantly Hindered the Tugs' Performance as Result of the Over-speeding Engine ........................................................37

   iv The GASPARILLA and JESS NEWTON Had No Duty to Intervene in Pilot McGee's Orchestration of the Departure Maneuver ....................39

   v The Tugs Were Placed In Extremis As a Result of AFRAMAX's Malfunctioning Governor Actuator and her Crew's Failure to Promptly Respond to the Emergency ........................................................42

  E. ARM's Alleged Damages .....................................................................43

V. CONCLUSION...............................................................................................48

148906.06501/127410267v.2

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AEP Memco, LLC v. Wepfer Marine, Inc.*,
  2006 U.S. Dist. LEXIS 75331 (W.D. Tenn. 2006) ..................................................12

*Am. Mill. Co. v. Tr. of Distribution Tr.*,
  623 F.3d 570 (8th Cir. 2010) ................................................................................44

*American Zinc Co. v. Foster*,
  313 F. Supp. 671 (S.D. Miss.1970) .........................................................................5

*Andros Shipping Co. v. Panama Canal Zone*,
  184 F. Supp. 246 (D. Canal Zone May 9, 1960) ......................................................2

*Bommarito v. Penrod Drilling Corp.*,
  929 F.2d 186 (5th Cir. 1991) ..................................................................................2

*Boudoin v. J. Ray McDermott & Co.*,
  281 F.2d 81 (5th Cir. 1960) ..................................................................................42

*BP Expl. & Oil, Inc. v. Moran Mid-Atl. Corp.*,
  147 F. Supp. 2d 333 (D.N.J. 2001) .......................................................................44

*Brooklyn Eastern Dist. Terminal v. United States*,
  287 U.S. 170 (1932) ............................................................................................46

*Bucolo, Inc. v. S/V Jaguar*,
  428 F.2d 394 (1st Cir. 1970) ..................................................................................9

*Bunge Corp. v. M/V Furness Bridge*,
  558 F.2d 790 (5th Cir. 1977) .............................................................................4, 6

*Canal Barge Co. v. Torco Oil Co.*,
  220 F.3d 370 (5th Cir. 2000) .................................................................................4

*Chembulk Houston Pte Ltd. v M/V MONTE ALLEGRE*,
  2018 WL 2731402 (S.D.TX. Jun 7, 2018) .......................................................4, 6, 7

*Ching Sheng Fishery Co. v. United States*,
  124 F. 3d 152 (2nd Cir. 1997) .............................................................................22

*Compagnie Generale Transatlantique v. Venhorst*,
  1973 WL 6392549 (S.D. NY. Sept. 18, 1973) .......................................................43

iii

*Cont'l Ins. Co. v. L&L Marine Transportation Inc.*,
    2017 WL 4844272 (E.D. La. Oct. 26, 2017) ............................................................3

*Coumou v. United States*,
    107 F.3d 290 (5th Cir. 1997) ...................................................................................3

*Crowley American Transport, Inc. v. Double Eagle Marine, Inc.*,
    208 F. Supp. 2d 1250 (S.D. Ala. Apr. 4, 2002) ....................................................40

*Executive Jet Aviation, Inc. v. City of Cleveland*,
    409 U.S. 249 (1972)...................................................................................................1

*Exxon Co., USA v. Sofec, Inc.*,
    517 U.S. 830 (1996)...................................................................................................5

*Gaines Towing & Transp., Inc. v. Atlantia Tanker Corp.*,
    191 F.3d 633 (5th Cir. 1999) .................................................................................44

*In re Great Lakes Dredge & Dock Co.*,
    624 F. 3d 201 (5th Cir. 2010) ..................................................................................3

*Great Lakes Towing Co. v. Am. S.S. Co.*,
    165 F.2d 368 (6th Cir. 1948) .................................................................................40

*Guzman v. Jones*,
    804 F.3d 707 (5th Cir. 2015) .................................................................................10

*Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*,
    768 F.2d 1558 (11th Cir. 1985) ...............................................................................2

*Ionion S.S. C. of Athens v. United Distillers of America, Inc.*,
    236 F.2d 78 (5th Cir. 1956) .....................................................................................2

*Kim Crest, S.A. v. M.V. Sverdlovsk*,
    753 F. Supp. 642 (S.D. Tex. 1990) .......................................................................46

*Kingfisher Shipping Co. Ltd. v. M/V Klarendon*,
    651 F. Supp. 204 (S.D. TX Dec. 23, 1986)............................................................5

*Kyzar v. Vale Do Ri Doce Navegacai, S.A.*,
    464 F.2d 285 (5th Cir. 1972) ...................................................................................2

*Louisville & N. R. Co. v. The Commander*,
    199 F. Supp. 217 (S.D. Ala. 1961)........................................................................34

*Lykes Bros. S.S. Co., Inc. v. Great Lakes Towing Co.*,
    719 F. Supp. 1449 (E.D. Wis. Mar. 10, 1989) .....................................................37

iv

*Marine Transp. Lines, Inc. v. M/V Tako Invader*,
  37 F.3d 1138 (5th Cir. 1994) ...................................................................................46

*In re Mid-South Towing Co.*,
  418 F.3d 526 (5th Cir. 2005) ......................................................................................6

*Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*,
  716 F.3d 886 (5th Cir. 2013) ......................................................................................5

*Mon River Towing, Inc. v. Indus. Terminal & Salvage Co.*,
  No. CIV.A 06-1499, 2009 WL 904701 (W.D. Pa. Mar. 31, 2009) ..........................46

*Niels Finsen*,
  1931 A.M.C. 1014, 52 F.2d 795 (S.D.N.Y. 1931)....................................................34

*Old Time Molasses Co. v. New Orleans Coal & Bisso Towboat Co.*,
  31 F.2d 963 (5th Cir. 1929) .......................................................................................33

*Orient Mid-East Lines, Inc. v. Shipment of Rice on Board S.S. Orient Transporter*,
  496 F.2d 1032 (5th Cir. 1974) .....................................................................................2

*Osprey Ship Mgmt. Inc. v. Jackson Country Port Auth.*
  2007 WL 4287708 (S.D. MS. Dec. 4, 2017) .............................................33, 41, 42

*Pan-Am. Petroleum & Transp. Co. v. United States*,
  27 F.2d 684 (2d Cir. 1928)........................................................................................44

*Pelican Marine Carriers, Inc. v. City of Tampa*,
  791 F. Supp. 845 (M.D. Fla. 1992), aff'd sub nom. *Pelican Marine v. City of
  Tampa*, 4 F.3d 999 (11th Cir. 1993)..........................................................................23

*Pennzoil Prod. Co. v. Offshore Exp., Inc.*,
  943 F.2d 1465 (5th Cir. 1991) ...................................................................................44

*Pennzoil Prod. Co. v. Offshore Express, Inc.*,
  943 F.3d 1465 (5th Cir. 1991) .............................................................7, 24, 27, 29

*Polarus S. S. Co. v. T.S Sandefjord*,
  236 F. 2d 270 (2nd Cir. 1956)....................................................................................22

*Premier Dealer Servs. v. Duhon*,
  No. 12-1498, 2013 U.S. Dist. LEXIS 166661 (E.D. La. 2013)..........................10, 11

*Prudential Lines Inc. v. McAllister Bros. Inc.*,
  801 F.2d 616 (2nd Cir. 1986).....................................................................................46

*Puerto Rico Ports Auth. v. M/V MANHATTAN PRINCE*,
  897 F.2d 1 (1st Cir. 1990)..........................................................................................43

v

*Rimkus Consulting Grp., Inc. v. Cammarata*,
    688 F. Supp. 2d 598 (S.D. Tex. 2010) ............................................................10, 11

*SCF Waxler Marine LLC v. M/V ARIS T*,
    427 F. Supp. 3d 728 (E.D. La. 2019) ...............................................................12, 22

*SCF Waxler Marine LLC v. MV ARIS T*,
    2019 WL 6174981 (E.D. LA. Nov. 19, 2019) ...........................................................7

*Slatten, LLC v. Royal Caribbean Cruises Ltd.*,
    No. CIV.A. 13-673, 2014 WL 5500701 (E.D. La. Oct. 30, 2014) ..........................22

*Spokane P. & S. Ry. Co. v. The Fairport*,
    116 F. Supp. 549 (D. Or. May 6, 1953) ............................................................33, 34

*Stevens v. The White City*,
    285 U.S. 195 (1932)................................................................................................33

*Stolt Achievement v. Dredge B. E. LINDHOLM*,
    447 F.3d 360 (5th Cir. 2006) ...................................................................................5

*In re Ta Chi Navigation (Panama) Corp. S.A.*,
    513 F.Supp. 148 (E.D.La.), *aff'd*, 728 F.2d 699 (5th Cir.1984) .............................3

*The Baltimore*,
    75 U.S. (8 Wall.) 377 (1869) .................................................................................44

*The Blue Jacket*,
    144 U.S. 371, 392 (1892) .........................................................................................9

*The China*, 74 U.S.
    (7 Wall.) 53, 67–68 (1869) ......................................................................................5

*The Continental*, 81 U.S. 345, 354-355 (1871)..................................................................1

*The Oregon*,
    158 U.S. 186, 192-93 (1895) ...................................................................................6

*The Pennsylvania*,
    86 U.S. 125, 126 (1873)......................................................................................7, 22

*Union Oil of Cal. v. Tug Mary Malloy*,
    414 F.2d 669 (5th Cir. 1969) ...................................................................................9

*United Fruit Company v. Mobile Towing and Wrecking Company, Inc.*,
    177 F. Supp. ......................................................................................................4, 34

*United States v. Jacksonville Forwarding Co.*,
    18 F.2d 39 (5th Cir. 1927) .......................................................................................4

vi

*United States v. Reliable Transfer Co.*,
    421 U.S. 397 (1975) ..................................................................................5

*Virginia Intern. Terminals, Inc. v. M/V KATSURAGI*,
    263 F. Supp. 2d 1035. (E.D. Va. Jan. 10, 2003) ..............................39, 40

*Walker v. Harris*,
    335 F.2d 185 (5th Cir. 1964) .....................................................................2

**Statutes**

28 U.S.C. § 1391(b)(2) .....................................................................................1

33 U.S.C. §1333 ...............................................................................................1

**Other Authorities**

33 C.F.R. § 83 *et. seq* .....................................................................................7

33 C.F.R. § 83.02 .............................................................................................7

33 C.F.R. § 83.06 .............................................................................................8

33 C.F.R. § 83.07 .............................................................................................8

33 C.F.R. § 83.08 .............................................................................................8

Fed. R. Civ. P. 37 ...........................................................................................10

Local Rule 9(B)(3)(b) .......................................................................................1

Thomas J. Schoenbaum, ADMIRALTY & MARITIME LAW, §14:3 ..........................3

U.S. Inland Navagational Rule 2 ...................................................7, 21, 29, 41

U.S. Inland Navagational Rule 6 .......................................................... *passim*

U.S. Inland Navagational Rule 7 .......................................................... *passim*

U.S. Inland Navagational Rule 8 .......................................................... *passim*

148906.06501/127410267v.2

NOW INTO COURT, through undersigned counsel, comes Third-Party Defendants G&H Towing Company ("G&H") and Suderman & Young Towing Company ("S&Y" and with G&H collectively referred to as the "Tug Interests") who respectfully submit their Pre-Trial Proposed Conclusions of Law in accordance with Local Rule 9(B)(3)(b):

## PRE- TRIAL PROPOSED CONCLUSIONS OF LAW

### I.      JURISDICTION AND VENUE

1.      The Court possesses subject matter jurisdiction pursuant to 33 U.S.C. §1333, and venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

### II.     GOVERNING LAW

2.      Because the events at issue occurred on navigable waters of the United States and involve traditional maritime activity that had a substantial impact on maritime commerce, the maritime law of the United States governs the parties' dispute. *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972).

### III.    LEGAL STANDARDS

#### A.      General Maritime Law Principles Regarding Unseaworthiness

3.      As stated by the Supreme Court in *The Continental*, 81 U.S. 345, 354-355 (1871):

> When employed in navigation ships and vessels should be kept seaworthy and be well manned and equipped for the voyage, and in cases where they are not seaworthy or not well manned or equipped, and a collision ensues between such a vessel and one without fault in that respect, the owners of the vessel not seaworthy or not well manned and equipped cannot escape responsibility, if it appears that the unseaworthiness of the vessel or the want of a competent master or of a sufficient crew or of suitable tackle, sails, or other motive power, as the case may be, caused or contributed to the disaster; and as the owners of the vessel appoint the master and employ the crew,

1

they are also held responsible for their conduct in the control and navigation of the vessel.

4.  Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189-90 (5th Cir. 1991). A vessel is unseaworthy if it is not adequately prepared to successfully navigate foreseeable hazards or challenges it may face. *Walker v. Harris*, 335 F.2d 185, 191 (5th Cir. 1964).

5.  A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, or her appurtenances found to be in disrepair. *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285 (5th Cir. 1972). "Unseaworthiness may also result from improper maintenance of equipment or other related failures which make the vessel ill-suited for its duties at sea." *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1566 (11th Cir. 1985). In short, a "presumption of unseaworthiness exist[s] at the beginning of the voyage, where machinery, gear or appliances fail shortly after the beginning of the voyage without accident, stress of weather, or the like, furnishing an adequate explanation as a likely cause." *Ionion S.S. C. of Athens v. United Distillers of America, Inc.*, 236 F.2d 78, 80 (5th Cir. 1956). The faulty operation of a vessel's engines constitutes unseaworthiness. *Andros Shipping Co. v. Panama Canal Zone*, 184 F. Supp. 246, 260 (D. Canal Zone May 9, 1960).

6.  An incompetent or inexperienced crew can also potentially create an unseaworthy condition. *Orient Mid-East Lines, Inc. v. Shipment of Rice on*

*Board S.S. Orient Transporter*, 496 F.2d 1032, 1040 (5th Cir. 1974).  As noted in *In re Ta Chi Navigation (Panama) Corp. S.A.*, 513 F. Supp. 148, 158 (E.D. La.), *aff'd*, 728 F.2d 699 (5th Cir.1984), "if incompetence results in navigational error which causes a collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the ... damage."

7.     To establish unseaworthiness, the claimant must demonstrate that the vessel (or her crew) was not reasonably fit to perform or do the work at hand.  See *Cont'l Ins. Co. v. L&L Marine Transportation Inc.*, 2017 WL 4844272, at *3 (E.D. La. Oct. 26, 2017)(quoting *Farrel Lines v. Jones*, 530 F.2d 7, 10 n.2 (5th Cir. 1976)).  The party must also establish that the unseaworthy condition was the proximate cause of the injury or damages.  *Id*.

**B.     General Maritime Law Principles Regarding Negligence**

8.     The standard of care in maritime negligence cases is "reasonable care under existing circumstances." *Coumou v. United States*, 107 F.3d 290, 295-96 (5th Cir. 1997).  "This standard necessarily can be applied only on a case by case basis considering the circumstances under which the casualty took place." Thomas J. Schoenbaum, ADMIRALTY & MARITIME LAW, §14:3, at 123 (3rd Ed. 2001).

9.     To prevail on a maritime negligence claim, the plaintiff (in this instance, ARM) has the burden of proving by a preponderance of the evidence that: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff sustained an injury.  *See In re Great Lakes*

3

*Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010); *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

10. Establishing breach of a duty and causation is critical to the abovementioned analysis. "Fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Chembulk Houston Pte Ltd. v. M/V MONTE ALLEGRE*, 2018 WL 2731402 (S.D. TX. Jun. 7, 2018) (Miller, J), citing *Inter-Cities Nav. Corp v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979). "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor causing the collision.'" *Id.*, citing *Am. River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998).

11. With these general maxims in mind, a fully-manned vessel, operating with the assistance of tugs pursuant to its orders and control, must be operated with due care and reasonable skill and attention to duties. *United States v. Jacksonville Forwarding Co.*, 18 F.2d 39 (5th Cir. 1927). Moreover, a master of a vessel is ultimately responsible for the maneuvers of his ship, even when tugboats are involved and even though the Master's vessel is being navigated by a compulsory pilot as required by applicable state law. See *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 798 (5th Cir. 1977).

12. "A compulsory pilot's decisions are not negligent if they are the decisions a competent compulsory pilot might reasonably have made under the same circumstances; thus, due care and skill is required of a compulsory pilot but not infallibility." *United Fruit Company v. Mobile Towing and Wrecking*

148906.06501/127410267v.2

*Company, Inc.*, 177 F. Supp. at 302; *American Zinc Co. v. Foster*, 313 F. Supp. 671, 682 (S.D. Miss.1970).  Moreover, "[i]t is the duty of the captain to interfere with a pilot's orders in cases of danger **which the pilot does not foresee** and in all cases of great necessity." *Kingfisher Shipping Co. Ltd. v. M/V Klarendon*, 651 F. Supp. 204, 207 (S.D. TX Dec. 23, 1986)(emphasis added), citing The China, 74 U.S. (7 Wall.) 53, 67–68 (1869).

13. Apportionment of fault in a collision case is based on comparative fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975).  However, "[t]he calibration of culpability simply is not susceptible to any real precision." *Stolt Achievement v. Dredge B. E. LINDHOLM*, 447 F.3d 360, 369 (5th Cir. 2006). In *Exxon Co., USA v. Sofec, Inc.*, 517 U.S. 830, 836-39 (1996) the Supreme Court held that the common law negligence doctrines of proximate causation and superseding cause apply in admiralty, notwithstanding the adoption of comparative fault.  Thus, even after *Reliable Transfer*, a Court may still specifically determine that one out of multiple alleged tortfeasors is fully at fault and 100% responsible for a particular maritime incident, depending on the facts of the case.

**C.  The *Oregon* Rule**

14. An "allision" is a collision between a moving vessel and a <u>stationary object</u>. See e.g. *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, n 3 (5th Cir. 2013).  The marine casualty that is the subject of the above-captioned litigation is classified as an allision, as there is no dispute the AFRAMAX struck the fixed ITC dolphins on Sept. 6, 2016.

148906.06501/127410267v.2

**15.**     Under the *Oregon* Rule, it is presumed that a moving vessel operating under its own power is at fault when it allides with a stationary object.  *The Oregon*, 158 U.S. 186, 192-93 (1895).   Where it applies, "*The Oregon* creates a presumption of fault that shifts the burden of production and persuasion to a moving vessel who, under her own power, allied with a stationary object." *Combo Maritime, Inc.* 615, F.3d 605.   A vessel may rebut the presumption by showing by a preponderance of the evidence that the allision was the fault of the stationary object, the vessel acted with reasonable care, or the allision was an unavoidable accident.  *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977).   However, the Fifth Circuit has instructed that the *Oregon* Rule is only "designed to fill a factual vacuum."  *In re Mid-South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005) (quoting *Rodi Yachts, Inc. v. Nat'l Marine, Inc.*, 984 F.2d 880, 887 (7th Cir. 1993)).   "[W]ith the presence of evidence of fault in the record, the need for presumptions [like the *Oregon* Rule] evaporates."  Id. at 607.

**16.**     In this instance, the Court determines that the presumption of the *Oregon* is unnecessary, given the clear evidence in the record of AFRAMAX's fault as described in greater detail below.

**D.**     **The *Pennsylvania* Rule and the U.S. Inland Navigation Rules**

**17.**     "Establishing liability in a collision case is eased by the *Pennsylvania* rule, which provides that when a vessel is in violation of a statutory duty, the burden is on the offending vessel to prove that its conduct did not and could not have caused the collision."  *Chembulk Houston Pte Ltd. v. M/V MONTE ALLEGRE*, 2018 WL 2731402 (S.D. TX. Jun. 7, 2018) (Miller, J), citing

148906.06501/127410267v.2

*The Pennsylvania*, 86 U.S. 125, 126 (1873).  "If [the violating party] is to escape liability for the loss, it must prove not just that its violation probably was not, but in fact could not have been a cause of the collision."  *Pennzoil Prod. Co. v. Offshore Express, Inc.*, 943 F.3d 1465, 1472 (5th Cir. 1991). This Court has described the offending vessel's burden of proof as a "heavy" one.  *Chembulk Houston Pte Ltd. v. M/V MONTE ALLEGRE*, 2018 WL 2731402 (S.D. TX. Jun. 7, 2018).

18.   Certain maritime regulations, such as the U.S. Inland Navigational Rules of the Road, (the "Rules") are relevant in evaluating the contours of the applicable standard of care in instances where they apply to the facts of the casualty.[1]  See *SCF Waxler Marine LLC v. MV ARIS T*, 2019 WL 6174981, *18 (E.D. LA. Nov. 19, 2019).  There is no dispute that the Rules apply to the Houston Ship Channel.  See *Chembulk Houston Pte Ltd. v. M/V MONTE ALLEGRE*, 2018 WL 2731402, *6 (S.D. TX. Jun. 7, 2018) (Miller, J).

19.   Rules 2, 6, 7 and 8 are relevant to this incident.  These Rules state in pertinent part:

**Rule 2: Responsibility**[2]

(a)  Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seaman, or by the special circumstances of the case.

---

[1] The Inland Navigational Rules Act of 1980, Pub. L. No. 96-591, which codified the Rules at 33. U.S.C. §§2001-2038, was repealed in 2010. The current Rules are set forth in Title 33 of the U.S. Code of Federal Regulations.  See 33 C.F.R. §83 *et. seq*.
[2] 33 C.F.R. §83.02.

(b)  In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

**Rule 6 - Safe Speed**[3]

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

(a)     By all vessels:

i.     the traffic density including concentration of fishing vessels or any other vessels;

ii.     the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

**Rule 7 - Risk of Collision**[4]

(a)     Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists.  If there is any doubt such risk shall be deemed to exist.

(b)     Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

(c)     In determining if risk of collision exists the following considerations shall be among those taken into consideration:

(i)     such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change.

(ii)     such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

**Rule 8 - Action to Avoid Collision**[5]

(a)     Any action taken to avoid collision shall be taken in accordance with the Rules of this subpart (Rules 4-19) … and shall, if the circumstances of

---

[3] 33 C.F.R. §83.06.
[4] 33 C.F.R. §83.07.
[5] 33 C.F.R. §83.08.

148906.06501/127410267v.2

the case admit, be positive, made in ample time and due regard to the observance of good seamanship.

…

(d)     If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

E.     **The *In Extremis* Doctrine**

20.     The doctrine of *in extremis* has long been a part of admiralty law.  In *The Blue Jacket*, 144 U.S. 371, 392 (1892), the doctrine was stated as follows: "[W]here one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been maneuvered with perfect skill and presence of mind."  Indeed, the Fifth Circuit has instructed that "a ship has no right to put another ship into a situation of extreme peril, and then charge that other ship with misconduct."  *Union Oil of Cal. v. Tug Mary Malloy*, 414 F.2d 669, 674 (5th Cir. 1969).  However, in *Bucolo, Inc. v. S/V Jaguar*, 428 F.2d 394, 396 (1st Cir. 1970), we stated the doctrine "is applicable only when the party asserting it was free from fault until the emergency arose."

IV.     **ANALYSIS**

21.     When the facts of the case are harmonized with the above-referenced legal principles, the Court finds that the AFRAMAX is solely liable for the causing the allision with the ITC dolphins shortly after midnight on Sept. 6, 2016.  That liability is based upon the unseaworthiness of the AFRAMAX's Governor System in accelerating during the departure evolution and failing to respond to Pilot McGee's commands, as well as multiple acts of

9

negligence committed by the AFRAMAX's crew in promptly appreciating and then responding to the risk of allision, all of which results in a finding of sole liability against ARM interests.

22.     Reciprocally, the Court determines that Tug Interests' actions played no part in the casualty at issue.

**A.    The Governor System Components were Discarded by ARM, which Results in an Inference that it Was Not In A Good Condition During the Entire Departure Evolution**

23.     Under federal law, "[s]poliation of evidence 'is the destruction or the significant and meaningful alteration of evidence.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015), quoting *Rimkus Consulting*, 688 F. Supp. 2d at 612.

24.     Federal courts address allegations of spoliation of evidence "through the inherent power to regulate the litigation process if the conduct occurs before a case is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010) (citations omitted).

25.     Because the alleged spoliation in this case occurred before the litigation was filed, it is properly addressed under this Court's inherent power, rather than Fed. R. Civ. P. Rule 37.

26.     A duty to preserve evidence arises "when a party knows or should know that certain evidence is relevant to pending or future litigation." *Premier Dealer Servs. v. Duhon*, No. 12-1498, 2013 U.S. Dist. LEXIS 166661, *15 (E.D. La. 2013) (citing *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010)) (emphasis added).  "Once litigation

10

is reasonably anticipated, a potential party to that litigation has a duty not to destroy 'unique, relevant evidence that might be useful to an adversary.'" *Id*., (quoting *Toth v. Calcasieu Parish*, 2009 U.S. Dist. LEXIS 16116, *5 (W.D. La. 2009).

27.   "[A] party seeking the sanction of an adverse inference instruction based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Rimkus Consulting*, 688 F. Supp. 2d at 615-16 (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)).

28.   "In order to sanction a party for spoliation of evidence, the party who destroyed evidence must have a 'culpable state of mind.'" *Premier Dealer Servs. v. Duhon*, 2013 U.S. Dist. LEXIS 166661, at *15 (E.D. La. 2013) (citing *SJS Distrib. Sys. v. Sam's East, Inc.*, 2013 U.S. Dist. LEXIS 147549, *3 (Oct. 11, 2013)).

29.   "Culpability is not established by any bright line test, but rather, analyzed on a case-by-case basis." *Id*.  "Therefore, culpability ranges from bad faith or intentional destruction of evidence by a party, to the gross negligence of a party to preserve evidence once the party knew or should have known that litigation was imminent." *Id*., citing *Yelton v. PHI, Inc.*, 279 F.R.D. 377, 391 (E.D. La. 2011) (emphasis added).

11

30.    An instructive example of spoliation jurisprudence is found in *AEP Memco, LLC v. Wepfer Marine, Inc.*, 2006 U.S. Dist. LEXIS 75331 (W.D. Tenn. 2006), where the court held that a fleet operator who fails to preserve mooring lines after a breakaway commits spoliation: "[f]ailing to preserve the lines used to moor the barges involved in the breakaway creates a rebuttable adverse inference that the missing lines were inadequate to secure those barges." *See also SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 768-769 (E.D. La. 2019)(finding spoliation inference at Fn. 181 where vessel owner discarded barge "face wire" equipment that parted during multi-vessel passing event and was thereafter suspected to have been a contributing cause of barge breakaway).

31.    That same type of inference is warranted here because the Governor System components that experienced the "abnormality" were admittedly discarded by ARM shortly after the incident on or about Sept. 9, 2016. *See* Tug Ex. 175, Aframax Response to ITC Interrogatory No. 9.   Due to the unavailability of this evidence, Tug Interests sought an adverse inference against ARM that the Governor System was not is a good condition and was unseaworthy during the entire departure evolution. See Dkt. 93. The Court agrees that an adverse inference is warranted here.

32.    ARM knew of the need to preserve all relevant evidence aboard the Vessel within a few minutes after the allision.   At 00:02:00 on Sept. 6, 2016, an entry was made in the AFRAMAX's Bell Book that "*V/L given to stop command but engine not responded at all*." Tug Ex. 60, Bell Book.  Less

than 10 hours later, the U.S. Coast Guard issued a "Captain of the Port Order" to the Vessel; it was clear by that time that a government investigation was underway.  Tug Ex. 65, Captain of the Port Order.  Later that day (Sept. 6) ARM sent an internal email to Master Kumar discussing the potential causes of the "*malfunction of Main Engine operation when speed on Astern and then not stopping when on Bridge control*," including issues with the Governor Actuator.  Tug Ex. 76, Vessel ESM email.  The Master, Chief Engineer, and other key crew members were interviewed by the Coast Guard and other authorities over the next few days regarding the over-speeding.

33.     Furthermore, the Governor Actuator and PCB circuit board were evaluated by a Nabtesco technician on Sept. 9, 2016, and at that time the technician determined that the Governor Actuator System "encountered abnormality momentarily but was later found recovered to normal operation."  Tug Ex. 83, Nabtesco Service Report.  That is an important moment; it demonstrates that ARM was aware of the fact that these pieces of equipment had malfunctioned.  Clearly, ARM was aware that the Governor Actuator and PCB were critical and important pieces of evidence.  It therefore strains credulity for ARM to have not appreciated that the Governor Actuator and PCB components were critical pieces of evidence that might later be used in the litigation it chose to file against Tug Interests.

34.     Based upon all of the above, the Court determines that ARM spoliated evidence by failing to retain the Governor Actuator and BCP circuit board

after the incident.  ARM was in the exclusive possession of this equipment.

ARM knew that these components were important, as they were suspected

to have been implicated in the incident from the moment it occurred.  ARM

clearly had a motive to discard the equipment to prevent Tug Interests from

having an opportunity to test same; ARM can't discard such evidence and

now unilaterally characterize the over-speeding and malfunction as "short,"

"brief" and "momentary."

35.     Based upon the above, the Court concludes that ARM's failure to preserve

the Governor Actuator and PCP board amount to intentional acts of

concealment (or at a minimum gross negligence in failing to retain the

equipment), and Tug Interests are entitled to an adverse inference that the

Governor System was not in good, seaworthy condition at the time of the

events at issue.

**B.**     **The AFRAMAX's Governor System was Unseaworthy and Its Malfunction
was a Proximate Cause of the Allision**

36.     Even with the abovementioned adverse inference, there is a mountain of

independent evidence in the record to conclude that the Governor System

was unseaworthy, and that its defective state was a proximate, contributing

cause of the incident.

37.     The Governor System was so integral to the operation of the Vessel that its

manufacturer Nabtesco created the a manual to ensure that the components

of the system were timely maintained on a scheduled basis.  Nabtesco

cautioned, with emphasis, that *"[t]o **assure** the system of **desired***

***performance** and further **safe operations**, it is **necessary** to securely*

14

*perform the maintenance / inspection of the parts*." Tug Ex. 16, Nabtesco Manual. These are not gentle recommendations, but affirmative required directives that establish a standard of care in properly maintaining such equipment.

38.     In connection with such requirements, Nabtesco created a separate Maintenance List, which confirmed that two key parts – the Governor Actuator and PCB – were to be "replaced" or "overhauled" every ten years. Tug. Ex. 17. In this instance, that replacement/overhaul would have been required by Sept. 12, 2012 (i.e., ten years after the Vessel's delivery).

39.     A shipowner exercising ordinary prudence and care should have followed the Maintenance List to ensure that the Governor System would work properly, but ARM did not. ARM's corporate deponent R. Srinivasan testified that there is no evidence these governor Actuator or PCB were timely replaced before the incident. See Tug Ex. 196, Srinivasan Depo, Pgs. 45-48.  Indeed, ARM admitted as such in the ARM Incident Report, when it concluded that ARM's maintenance manuals failed to include the 10-year renewal requirements for these two pieces of equipment. Tug Ex. 77, AMR Incident Report.[6]  Under the circumstances, ARM's failure to properly maintain the Governor Actuator and PCB circuit board rendered these pieces of equipment unseaworthy, as they were almost four years overdue for replacement by the time of the Sept. 6, 2016 incident.  The fact that these

---

[6] See Tug Interests' *Motion in Limine* dated December 30, 2021 (Dkt. 92), which seeks to deemed certain portions of the ARM Incident Report as admitted as a result of ARM's failure to timely produce the report during discovery.  The Court has not yet ruled upon that Motion as of the date of filing this pre-trial proposed Conclusion of Law.

items were required to be replaced after the incident clearly leads to the inference that they were both unseaworthy at the time of the incident.

40.     Putting aside ARM's failure to abide by Maintenance List and properly maintain and  replace the parts at issue, there is ample evidence in the record to conclude that the Governor System (which included the Governor Actuator and PCB) failed during the incident, and that this failure was a proximate, contributing cause of the allision.

41.     ARM has conceded in its Third-Party Complaint that "despite the command input of dead slow astern, the Vessel's engine over-sped for a short period and the Vessel's speed briefly increased."  ARM Third Party Complaint, Dkt. 25, Para. 63.  ARM went on to determine that "*the Main engine governor actuator momentarily mal-functioned.  The positioner feedback sense within the governor actuator relayed the wrong signal and thereby, the actuator continued to release maximum fuel into the main engine.  Thus increasing the RPM to 80, instead of the telegraph command of 30.*"  Tug Ex. 77, AMR Incident Report.  ARM's characterizations of the engine over-speeding and malfunction as "short," "brief" and "momentary" are self-serving; these statements alone constitute direct admissions that the Governor System was not functioning properly at the time of the departure evolution – a fact later confirmed by the Nabtesco technician when it noted that the Governor Actuator system encountered an "abnormality momentarily" and that "as a precautionary measure" the Governor Actuator and PCB required replacement.  All of this supports the simple conclusion

148906.06501/127410267v.2

that the Governor System was not in good working order and was unseaworthy at the time of the departure evolution.

42. The following evidence separately confirms that the malfunction of the unseaworthy Governor System was a proximate, contributing cause of the incident.

43. Pilot McGee and Master Kumar testified that the intended astern departure speed for the AFRAMAX was Dead Slow Astern, and no greater than 30 RPMs / 2 knots.  The boundaries of that intended slow speed were set for good reason – the AFRAMAX is over 809 feet long, 137 feet abeam, and capable of generating over 17,403 Horsepower with her massive Engine. She was positioned with her stern only two ship's lengths away from the Dolphins on the opposite side.  Given the size of the Vessel in relation to her surroundings, it was critical for the departure evolution to occur slowly as intended and for the Vessel's Governor System to have been fully operable during this (and any other) evolution.

44. Pilot McGee (through Master Kumar) issued his first order for Dead Slow Astern at approximately **23:59:19**, and the EOT was set to Dead Slow Astern. Tug Ex. 48-49, VDR. This order was relayed by Master Kumar to 3/0 Emmanuel Sajeev, who acknowledged that the Engine was allegedly maneuvering at Dead Slow Astern at **23:59:39**. Tug Ex. 48-49, VDR. This should have resulted in a maximum astern speed of 30 RPMs. Stated another way, the AFRAMAX's Engine should not have proceeded beyond 30 RPMs astern or 2.0 knots at any time after **23:59:39** … but it clearly did.

17

45. The ARM Incident Report states that "*[t]he Chief Engineer, supervising the overall engine room operation, after about 1 minute of the main engine operation, realized that the engine RPM had exceeded the designated RPM associated with the Dead Slow Astern and had reached 80 RPM on the tachometer.*"  Tug Ex. 77, AMR Incident Report.  That would have been at approximately **00:00:39** on the VDR (i.e. one minute after 3/0 Sajeev began maneuvering at Dead Slow Astern).  Therefore, as early as **00:00:39** in the departure sequence, the AFRAMAX crew was aware that the Vessel had exceeded the designated RPM setting for the departure evolution.  Indeed, the Vessel's Engine was not even rated for 80 RPMs; her EOT placard listed the maximum Emergency Full Astern RPMs at 70 RPMs, and the Pilot Card listed the Full Astern speed at 62 RPMs.  Tug Ex. 22, EOT Photo; Tug Ex. 41, Pilot Card.  The fact that the Vessel was now accelerating at beyond her rated full astern speed is clear evidence that the Governor Actuator was in a defective condition.

46. Moreover, the AFRAMAX's own EOT speed chart confirms that a speed of 80 RPMs would be the equivalent of a thrust capable of reaching **13.35 knots** – a significant astern speed, considering the large size of the AFRAMAX and her close proximity of less than two ship's lengths away from the Dolphins and other vessels on the opposite side of the Channel.  Tug Exs. 22, 23, EOT photos.

47. Contrary to ARM's suggestion, the Governor System's RPM over-speeding malfunction was neither "short," "brief," nor "momentary."  It began as

18

early as **00:00:39** when it was first visually observed by C/E Ali. By **00:01:57**, the Vessel's astern speed had reached 2.1 knots astern, and was thus beyond the intended 2.0 knot astern speed for the evolution, indicating that the Engine was still operating at full capacity. Tug Ex. 48-49, VDR. The Vessel continued to accelerate astern until **00:03:42**, at which time the Vessel reached an astern speed of 3.7 knots. *Id.* Tug Interests' hydrodynamic expert Charles Munsch credibly testified that this would translate into approximately 13,000 Horsepower astern.

48. Thus, it is reasonable to assume from these facts that the 80 RPM over-speeding significantly increased the astern thrust of the AFRAMAX for at least three full minutes into the departure evolution, if not longer (i.e., from **00:00:39** when the 80 RPMs were first witnessed by her Engine Room crew through **00:03:42**, when the Vessel reached an astern speed of 3.7 knots). In turn, the AFRAMAX's own VDR confirms that she accelerated beyond the intended astern speed of 2.0 knots from approximately **00:01:57** (when she went to 2.1 knots) until **00:05:45** (the approximate moment of allision, at which time she went from 2.1 to 2.0 knots); i.e., underlined almost four full minutes. Tug Ex. 48-49, VDR.

49. In addition to the over-speeding, the Governor System clearly failed to respond to Pilot McGee and Master Kumar's additional engine order commands. At **00:02:37**, Pilot McGee issued a "Stop Engine" order. Tug Ex. 48-49, VDR. However, it is clear from the VDR evidence that the Governor System did not respond to that command, or any of Pilot McGee's

other commands that he issued prior to the allision.  He succinctly testified ""*I was getting no response from any order I gave*."  Tug Ex. 192, McGee Depo, Pg. 42.  He further testified "*If they would have done exactly what I asked them to do, we would have got the engine order I asked for.  If the engine would have stopped when I asked for it, none of this stuff would have happened.  But instead – instead of stopping when I asked to stop and come ahead on all the engine order to try and slow it down, it just kept speeding up*."  *Id.*, McGee Depo, Pg. 52.

50.   Master Kumar separately conceded that from the moment of departure (around **23:59:19** on Sept. 5, 2016) up until the time of the Emergency Stop initiation (at 00:05:00 hours on Sept. 6, 2016), the vessel's Engine was not responding to the Bridge EOT commands, and that it was "stuck" in astern direction.  Tug Ex. 190, Kumar Depo, Pg. 148.  Obviously, the departure evolution contemplated that the EOT would respond to all commands and work properly throughout the entire sequence, but it did not.  This results in the conclusion that it was not fit for its intended purpose and was unseaworthy.

51.   Based upon all of the above, the Court determines that the malfunction of the Governor System resulted in an unseaworthy condition that caused a dangerous over-speeding event that at a minimum lasted over three minutes and which caused the AFRAMAX to accelerate far beyond her intended astern thrust and speed of dead slow astern (30 RPMs / 2.0 knots) to over Emergency Full Speed Astern (80 RPMs / 3.7 knots).  Moreover, the

Governor System malfunction also caused the EOT to not respond to commands at any time after Pilot McGee's Dead Slow Astern order was first initiated through the moment of allision.  The occurrence of these dual failures under the circumstances of the departure constitute "substantial and material factors" of unseaworthiness which proximately caused the AFRAMAX to transit across the Channel and allide with the Dolphins.

52.     The AFRAMAX Crew's actions discussed below separately support a finding of unseaworthiness that constitutes a proximate, contributing cause of the allision.

## C.     The AFRAMAX Violated Rules 6, 7, 8 and 2, Which Were All Proximate and Contributing Causes to the Allision

53.     The AFRAMAX's crew violated numerous Rules as outlined below, all of which separately constitute negligence and result in a finding that these negligent acts all were proximate, contributing causes of the allision.

### i     The AFRAMAX Violated the Rule 6 Governing Safe Speed

54.     Rule 6 deals with a vessel's requirement to "at all times proceed at a safe speed" so that she can take the necessary action to avoid collision and be stopped at an appropriate distance under the circumstances of the evolution. Notably, the phrase "safe speed" is not defined in the Rules, reflecting the principle that the determination of what constitutes a "safe speed" can only be decided on a case-by-case basis.

55.     In the *Pennsylvania*, the Supreme Court cautioned (in construing Rule 6's predecessor) that what constitutes a moderate speed "may not be precisely definable," and continued: "[i]t must depend upon the circumstances of

each case.  That may be moderate and reasonable in some circumstances which would be quite immoderate in others."  86 U.S. 125, 133 (1873).

56.     "Rule 6 of the Inland Rules clearly requires judgment and assessment of particular circumstances" in evaluating whether a particular speed is safe. *Slatten, LLC v. Royal Caribbean Cruises Ltd.*, No. CIV.A. 13-673, 2014 WL 5500701, at *5 (E.D. La. Oct. 30, 2014). Rule 6's factors are "taken into account … [i]n determining a safe speed, including the state of visibility, traffic density, vessel maneuverability with special reference to stopping distance, and any constraints imposed by the radar range scale employed. This list is not exhaustive." *SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 760 (E.D. La. 2019). In the end, the "question of what constitutes "safe speed' is relative to the situation confronting the vessel at any given moment." See *Ching Sheng Fishery Co. v. United States,* 124 F. 3d 152, 159 (2nd Cir. 1997); see also *Polarus S. S. Co. v. T.S Sandefjord*, 236 F. 2d 270 (2nd Cir. 1956) (noting that "moderate speed" is "undoubtedly less than full speed," and is a "relative" term which "depends on the peculiar circumstances of each case").

57.     ARM submits that because the AFRAMAX only reached a maximum speed of 3.7 knots, the speed was "safe."   However, that argument ignores AFRAMAX's own directive set forth within the Vessel's "Master/Pilot Information Exchange" and signed by Master Kumar and Pilot McGee which listed the "maximum speed allowed" for departure as 2.0 knots astern. Tug Ex. 40. ARM's speed argument also misconstrues the scope of Rule 6;

any speed of a Vessel can be potentially "unsafe" if the right conditions and facts are present.  To be sure, it was inappropriate under the "prevailing circumstances and conditions"[7] for the AFRAMAX to have generated over 80 RPMS of astern thrust (resulting in a speed of 3.7 knots astern) in the Channel with less than two ship's lengths of maneuvering room. Indeed, Master Kumar admitted as such; he testified that he has never departed a berth a full astern speed: "*I mean, that would be unsafe.*"[8]

58.    The closely analogous case of *Pelican Marine Carriers, Inc. v. City of Tampa*, 791 F. Supp. 845, 853 (M.D. Fla. 1992), aff'd sub nom. *Pelican Marine v. City of Tampa*, 4 F.3d 999 (11th Cir. 1993) illustrates this point. In *Pelican*, a 612 foot tanker vessel was under the command of a Tampa pilot and being assisted by two tugs in a 400-foot channel as she approached her berth.  *Id*. at 850-851.  The Vessel was travelling at only **3 knots** when she collided with a submerged object.  *Id*.  The Court determined that the grounding was due to the loss of control of the vessel during its approach to the dock, and that a speed in excess of 2 knots was excessive under the circumstances in violation of Rule 6, especially due to the Vessel's close proximity to another vessel and berths.   *Id*. at 853-854.   The Court specifically held that the Vessel owner could not overcome the *Pennsylvania* Rule presumption implicated by the Rule 6 violation.  *Id*. at 853.

---

[7] Rule 6.
[8] Tug Interest Fact No. 68.

59.     An identical conclusion is warranted here.  In this instance, the AFRAMAX violated Rule 6 by proceeding in excess of the intended 2.0 knot astern speed limit and continuing up to 3.7 knots astern at significant thrust beyond the rated capacity for the Engine in an area of severely restricted maneuverability close to other vessels and berths.  The AFRAMAX's own VDR demonstrates that she accelerated beyond the intended dead slow astern speed of 2.0 knots from approximately **00:01:57** (when she accelerated to 2.1 knots) until **00:05:45** (the approximate moment of allision, i.e., almost four full minutes). Tug Ex. 48-49, VDR.  Moreover, the fact that the Vessel's Engine increased in speed to over 80 RPMs (over twice the intended astern speed at over Emergency Full Speed Astern) in a channel less than two ship's lengths away from the Dolphins placed her in a situation where she was unable to "*take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions*." Rule 6. That violation implicates the *Pennsylvania* rule.  Thus, AFRAMAX must prove that the unsafe speed violation did not, and could not, cause the allision.  *Pennzoil Prod*. 943 F.3d at 1472.  ARM failed to do so.  Accordingly, the AFRAMAX is at fault for maneuvering astern at an unsafe speed during the departure evolution, and this violation was a proximate, contributing cause of the allision.

ii      ***The AFRAMAX Violated Rule 7 When Her Crew Failed to Determine that a Risk of Allision Existed as She Over-sped Across the Channel and Approached the ITC Dolphins and Ships Berthed at ITC / Vopak***

24

60.     Rule 7 addresses the things a vessel must do to ascertain whether a risk of collision exists.  It requires that a vessel use all available means "appropriate to the prevailing circumstances and conditions" to determine if a risk of collision exists.  There are multiple examples which demonstrate that the crew of the AFRAMAX violated Rule 7 by failing to determine that a risk of allision existed here until it was far too late.

61.     In the first instance, there is no dispute that the AFRAMAX crew was aware of the location of the Dolphins at the start of the evolution; Master Kumar and Pilot McGee were both aware of their presence, and the AFRAMAX's Second Officer was positioned on the stern of the Vessel and reporting distances as the Vessel approached the other side of the Channel.  As such, the crew was charged with knowledge of the Dolphin's locations from the beginning of the departure evolution.

62.     At **23:59:39** on Sept. 5, 2016 3/0 Sajeev reported to Master Kumar that the Engine was maneuvering at Dead Slow Astern; however, he then turned away from monitoring the RPMS and "engaged himself into record keeping."  Tug Ex. 77, AMR Incident Report.  As such, he failed to independently notice the RPM increase from the Bridge.  3/0 Sajeev's inattention in closely monitoring the RPMs and doing record keeping during the beginning of the departure evolution was a violation of Rule 7 and a proximate, contributing cause of the allision.

63.     The risk of allision with the Dolphins materialized as early as **00:00:39** on Sept. 6, 2016 when the ERC team first became aware that the AFRAMAX's

Engine was significantly over-speeding at 80 RPMs; this issue was reported to the bridge at **00:00:53** when 2/E Ramesh (in the ERC) called 3/O Sajeev (on the bridge).   Tug Ex. 48-49, VDR.  However, once armed with this knowledge 3/O Sajeev failed to report this alarming issue to Master Kumar. ARM's own Incident Report states that 3/O Sajeev "*noted excessive rpm of the engine but failed to report the matter to the master.  He did not do so thinking that 2/eng was now aware of this abnormal situation and was taking necessary action to restore normal operation*."  Tug Ex. 77, ARM Incident Report. 3/O Sajeev's failure to report the over-speeding issue to Master Kumar and promptly communicate with the ECR was a proximate, contributing cause of the allision and a separate violation of Rule 7.

64.      A separate failure of Rule 7 occurred when the AFRAMAX crew attempted to stop the engine.  Master Kumar ordered the Engine to "Stop" at **00:02:37**. Tug Ex. 48, VDR.  But between that time and **00:03:28**, 3/O Sajeev confirmed to Master Kumar **three times** that the Engine was not responding to commands.  The repeated failure of the Vessel to respond to Master Kumar's "Stop" order should have also alerted him to a different emergency situation, i.e. that the Vessel's EOT was not responding to commands.  The Court determines that a prudent master using good seamanship should have appreciated after three warnings that the failure of his Vessel's engine to respond to commands created a clear risk of allision, given the proximity of the Vessel to other ships and known structures in the channel. The Court determines that Master Kumar's failure to immediately appreciate the risk

26

of allision after receiving such warnings was a violation of Rule 7 and a proximate and contributing cause of the allision.

65.     The abovementioned Rule 7 violations implicate the *Pennsylvania* rule. Thus, AFRAMAX must prove that the failure to properly ascertain whether a risk of allision existed did not, and could not, cause the allision. *Pennzoil Prod.* 943 F. 3d at 1472. ARM failed to do so.   Accordingly, the AFRAMAX is at fault for failing to promptly appreciate that a risk of allision existed, and this violation was a proximate, contributing cause of the allision.

> ### iii    *The AFRAMAX Violated Rule 8 by Failing to Timely Take Action to Avoid Allision*

66.     The AFRAMAX Crew's failures in appreciating the unfolding risk of allision with the Dolphins apply equally to their failures to take timely action to avoid the allision.  As outlined above, a risk of allision certainly existed as early as **00:00:39** when it became apparent to the Vessel's Engine Room crew that the Engine's RPMs had more than doubled in revolutions to 80 RPMs; a very serious issue for any Vessel, let alone an 809-foot tanker with only two ship's lengths of astern clearance. The AFRAMAX's VDR confirms that the Engine Room crew reported the 80 RPM acceleration to the Bridge at **00:00:53** by calling 3/0 Sajeev; that notification occurred over 4 minutes and 52 seconds before the allision (which occurred at approx. **00:05:45**). See Tug Ex. 48-49, VDR. In fact, ARM's own Incident Report faults the crew, stating that *"[i]mmediate action by the Bridge Team or the engine room team to stop the engine (activating the emergency stop), when*

*they noticed 80 revs in astern direction could not have allowed the vessel to gain high momentum and speed in astern direction*."  Tug Ex. 77, ARM Incident Report.  However, the AFRAMAX's crew did nothing to promptly address the problem.

67.     The ARM Incident Report went on to fault the AFRAMAX crew for other "inappropriate response[s]" to the developing situation.  These included:

-     3/0 Sajeev's failure to notify Master Kumar early on that the Engine had reached 80 RPMs.

-     "No action was consider [sic] necessary or taken by the Bridge team in reducing RPM or stopping the Main engine."

-     "Inappropriate response from engine room teams to an abnormal situation, after observing the unusually high RPM they did not take immediate action to bring the engine under control."  (with emphasis added).

-     "The Anchor was not dropped earlier."

68.     In addition to these documented and admitted failures, it is clear from the facts and timeline above that as late as **00:03:28**, Master Kumar was separately aware (or should have been aware) that the AFRAMAX's Engine was not stopping or responding to commands when he was informed of this fact for the third time by 3/0 Sajeev.  3/0 Sajeev's third and final warning that the AFRAMAX's engine had "not stopped" occurred at **00:03:28**, which was 2 minutes and 17 seconds before the allision (which occurred at **00:05:45**). See Tug Ex. 48-49, VDR. Still, Master Kumar failed to activate the Vessel's Emergency Stop button; it was only activated by C/E Ali at approximately 00:05:00 (approximately 45 seconds before the allision), far too late.  And even then, the Vessel's anchors were only deployed *after* the

28

allision and explosion occurred, as evinced by the ITC video recording (which show the Vessel's starboard anchor deploying after the explosion).

69.    All of these facts fully support the conclusion that the AFRAMAX's crew separately violated Rule 8 by failing to take positive action in ample time to avoid the allision.  These Rule 8 violations implicate the *Pennsylvania* rule. Thus, AFRAMAX must prove that the failure to take appropriate action to avoid allision did not, and could not, cause the allision.  *Pennzoil Prod.* 943 F.3d at 1472.  ARM failed to do so.  Accordingly, the AFRAMAX is at fault for failing to avoid the allision, and this violation was a proximate, contributing cause of the allision.

### iv    The AFRAMAX Crew failed to demonstrate Good Seamanship in Violation of Rule 2

70.    The Court holds that all of the abovementioned infractions separately constitute clear violations of Rule 2, which independently obligated the AFRAMAX crew to abide by all precautions required by the ordinary practice of seamen, or by the special circumstances of the case.  The actions (or inactions) referenced above fall far below the ordinary practice of competent seamen and good seamanship, or otherwise created by the special circumstance of this case.  These Rule 2 violations implicate the *Pennsylvania* rule.  Thus, AFRAMAX must prove that the failure to take appropriate action to avoid allision did not, and could not, cause the allision. *Pennzoil Prod.* 943 F.3d at 1472. ARM failed to do so.  Accordingly, the AFRAMAX is at fault for failing to use good seamanship in responding to

29

the incident, and this violation was a proximate, contributing cause of the allision.

**D.    The Actions of the Assist Tugs GASPARILLA and JESS NEWTON Did Not Cause or Contribute to the Allision**

71.    ARM asks this Court to ignore all the abovementioned infractions and hold that Tug Interests separately breached a duty of care to the Vessel in allegedly failing to turn the AFRAMAX prior to the allision.  However, the facts at trial demonstrated that Tug Interests did not breach their respective duties to the Vessel in any respect, and they shoulder no responsibility for the allision.

*i    The Tug Crews Were Properly Trained and They Followed All of the Pilot's Orders*

72.    In the first instance, there is no evidence that Tug Interests failed to properly train the crews of the GASPARILLA or JESS NEWTON; the Court determines that all crewmembers aboard each of these vessels were properly trained seaman with all requisite licenses in place.

73.    ARM's counsel has otherwise argued that the GASPARILLA and JESS NEWTON were "improperly positioned" by their respective crews at the start of the departure maneuver, and that this alleged mispositioning prevented the Vessel from turning as intended. This argument - which appears to be predicated on the purported inexperience of the Tug crews - is a non-starter for numerous reasons.

74.    First, with respect to experience, Master Scott, Master Curry and Mate Arduengo all have many years of training in performing this exact maneuver, and the evidence demonstrated that they placed the tugs precisely in the

appropriate place for assisting an 809-foot oil tanker in departing HFO Dock 3 with an intended speed of Dead-Slow-Astern. Specifically, the GASPARILLA was placed along the Vessel's port bow, and the JESS NEWTON was placed near the port quarter just forward of the Vessel's Accommodation superstructure. All Tug operators testified that these are the standard tug positions for a departure involving an Aframax-sized tanker from this berth, and that they have done so in such positions on countless occasions.

75.   Second, both pilots aboard the AFRAMAX testified that they had no concerns with each Tug's position at any time during the evolution in question. Relief Pilot Phillips (who signed the Master-Pilot Exchange along with 3/0 Sajeev) was positioned outside on the Vessel's port bridge-wing directly above the JESS NEWTON during the entire departure sequence, and he had no complaints about her positioning at any time before or after the allision. Pilot McGee was also aware of the JESS NEWTON's position during the entire departure sequence - he could see both tugs on his "PPU" pilot computer. Tug Ex. 205. The evidence demonstrates that in addition to the Vessel's crew, both pilots had no issues whatsoever with the GASPARILLA or JESS NEWTON's positions at any time during the sequence at issue.

76.   Third, ARM points to a rough hand-drawing made on the Vessel's "Master-Pilot Exchange" form that appears to show the line for the JESS NEWTON placed behind the AFRAMAX RIVER's port-side Accommodation (i.e.

148906.06501/127410267v.2

closer to the AFRAMAX's stern). However, there is no evidence that the "Master-Pilot Exchange" was ever provided to the JESS NEWTON (or the GASPARILLA) before the departure. Further, there is nothing on the "Master-Pilot Exchange" form that expressly prohibited the placement of the JESS NEWTON's line forward of the Accommodation. In fact, Master Kumar testified that he was aware of the Tugs' position before the departure - he drew a separate schematic that showed the JESS NEWTON on the port side with her line intended for a bit forward of the Accommodation. See Tug Ex. 43, Master Kumar drawing. Ultimately, the AFRAMAX's crew secured the Tug's lines to the Vessel in this instance. The Court determines that the Vessel's crew were well-aware of precisely where the Tugs were positioned at the start of the maneuver; all facts which totally undercut ARM's new theory that the positioning of the Tugs were somehow "improper."

77.     Finally, it is unreasonable for ARM to suggest that either the JESS NEWTON or GASPARILLA were "improperly positioned" because they failed to anticipate the possibility that the Vessel might suffer a runaway engine and over-speed up to 80 RPMS almost three times beyond her intended speed from Dead Slow Astern to over Full Speed Astern. There is no evidence whatsoever that repositioning the Tugs in any alternative fashion before the incident would have enabled them to turn the Vessel given the unanticipated hydrodynamic conditions that were created solely by her runaway engine.

148906.06501/127410267v.2

78.     Now moving past ARM's "improper tug position" theory, the evidence at trial otherwise confirmed that both the GASPARILLA and JESS NEWTON followed all of Pilot McGee's Orders; ARM's arguments to the contrary are meritless.

79.     The contours of a Tug's duty to a vessel under pilot are well-defined; the tug must "exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Stevens v. The White City*, 285 U.S. 195, 202 (1932).  The burden rests with a plaintiff (in this instance ARM) to demonstrate that the damage to the vessel was caused by a breach of that duty.  *Id*.

80.     "When a tug is merely providing the motive power to the towed ship, with the towed ship's personnel exclusively directing and controlling the movements of both vessels, then fault cannot be imputed to an otherwise non-negligent tug." *Osprey Ship Mgmt. Inc. v. Jackson Country Port Auth.* 2007 WL 4287708 *4 (S.D. MS. Dec. 4, 2017) citing *Moran Towing and Transp. Co. Inc. v. Empresa Hondurena de Vapores*, 194 F.2d 629, 632 (5th Cir. 1952); *Old Time Molasses Co. v. New Orleans Coal & Bisso Towboat Co.*, 31 F.2d 963, 966 (5th Cir. 1929).  Stated another way, "[w]hen a tug is assisting a vessel, the tug is the servant of and is required to obey the orders of the master of the vessel." *Spokane P. & S. Ry. Co. v. The Fairport*, 116 F. Supp. 549, 552 (D. Or. May 6, 1953).  "Even though the master is in command of the vessel, the pilot is his technical advisor and, when the

148906.06501/127410267v.2

master and the pilot are on the bridge, the pilots orders, acquiesced in by the master, are the orders of the master." *Id*.

81. Tugs are ultimately exonerated from liability for allisions when there is evidence they were directed by the harbor pilot on board the tow during the incident, and that the tug(s) properly obeyed such orders. *Niels Finsen*, 1931 A.M.C. 1014, 52 F.2d 795 (S.D.N.Y. 1931). See also *Louisville & N. R. Co. v. The Commander*, 199 F. Supp. 217, 219 (S.D. Ala. 1961) (exonerating tugs "from liability because the tugs were not negligent. The tugs were operated under orders from the harbor pilot on board the tow in each instance. There is not the slightest evidence that his orders were disobeyed or improperly carried out."); accord; *United Fruit Co. v. Mobile Towing & Wrecking Co.*, 177 F. Supp. 297 (S.D. Ala. Sept. 20, 1959).

82. With these general maxims in mind, the facts established at trial demonstrate that the GASPARILLA and JESS NEWTON each followed all orders issued by Pilot McGee during the entire departure evolution. Accordingly, Tug Interests did all that they were required to do for this evolution.

83. Tug Interests' navigational expert Capt. Greg Nichols is a licensed Master with many years of experience in serving aboard large oceangoing vessels and operating tugs in and around the area at issue. He testified that throughout the operation and incident, both Tugs were maneuvering as ordered by Pilot McGee, that they promptly answered and responded to all orders, and that these actions would have been in line with standard

practices for the evolution at issue. He further opined that the Tugs' actions did not cause or contribute to the allision, and that the AFRAMAX's crew could have likely prevented the accident if they had taken action to control the out-of-control engine in a more-timely manner. Capt. Nicholls' expert testimony bolsters the conclusion that the Tugs' actions played no part in this incident.

### ii        The Tugs' Winches Played No Part in Causing the Allision

84.    To shift focus away from the well-documented failures referenced above, ARM argued at trial that the winches aboard the GASPARILLA and JESS NEWTON were "defective" and that this must have been the cause of the allision. This theory is dead in the water.[9]

85.    In the first instance, there is no dispute that the forward tug GASPARILLA's winch was not being used at the time of the incident; it was offline and awaiting repair. In any event, that fact is a red herring; tugboats have been assisting vessels for hundreds of years without winches, and the modern towing-assist assignment for the AFRAMAX was no different. The GASPARILLA was not required to use its winch for this or any other towing evolution, and the testimony at trial from G&H Capt. Steven Huttman demonstrated that the Tug had numerous ways to safely assist vessels such as AFRAMAX *sans* winch. Moreover, the

---

[9] Aframax Interests have at times vaguely described the condition of each tug as "unseaworthy." However, Aframax Interests failed to assert a cause of action for unseaworthiness in their Third-Party Complaint against Tug Interests. See Dkt. 34, Aframax Interest Third-Party Complaint, Pgs. 7-9 (failing to list unseaworthiness as a cause of action). Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189-90 (5th Cir. 1991). Because ARM has failed to plead this separate cause of action, issues of unseaworthiness are *per se* be excluded from trial. In any event, the court determines that neither tug was "unseaworthy."

GASPARILLA successfully assisted over four other vessels using a "conventional" towing arrangement with the Tug's H-bitt prior to the AFRAMAX assignment, all without incident. Tug Exs. 124-125, Daily Log. This conventional towing arrangement – wherein the GASPARILLA's towing line was secured directly to her bow H-Bitt  - was also used during the AFRAMAX move – without incident. ARM failed to establish any facts suggesting that the lack of the winch aboard the GASPARILLA played any part in the allision.

86. In the second instance, the facts produced at trial revealed that the aft tug JESS NEWTON's winch experienced a mechanical failure **after** the allision and fireball explosion as Mate Arduengo was attempting to back away from the fireball and (at the same time) recover the remaining melted portion of the tug's towing pendant. Multiple sources of evidence, including witness statements, U.S. Coast Guard Interviews, and the testimony of the JESS NEWTON's crew, all confirm that the JESS NEWTON followed all of Pilot McGee's orders and that the winch failure only occurred as the tug was backing away from the ensuing fire.

87. Separately, the evidence at trial demonstrated that the JESS NEWTON winch's hydraulic system is separate from its pneumatic brake system, and that the winch brake was always firmly secured during the departure sequence through the moment of allision. As such, The Court determines that the O-ring rupture that occurred within the JESS NEWTON winch's separate hydraulic system after the allision played no part in the incident.

36

### iii   The AFRAMAX Significantly Hindered the Tugs' Performance as Result of the Over-speeding Engine

88.   Tugs are also exonerated from liability in situations where, as here, the dominant vessel being towed actively hinders the tugs' performance.  See *Lykes Bros. S.S. Co., Inc. v. Great Lakes Towing Co.*, 719 F. Supp. 1449, 1458 (E.D. Wis. Mar. 10, 1989)(holding that there is no implied warranty of workmanlike service running from an assisting tug to a dominant vessel, and even if such a warranty did exist, its application would be barred if the vessel actively hindered the tug's performance).  That is precisely what occurred here.

89.   ARM goes to great lengths to suggest that the Tugs failed to "follow the agreed and arranged plan for unmooring the vessel."  Of course, the facts at trial established that the "agreed and arranged plan" for this evolution was to have the AFRAMAX maneuver at Dead Slow Astern at 30 RPMs / 2 knots.  The "agreed and arranged plan for unmooring the vessel" was certainly not to maneuver astern at beyond Emergency Full Astern speed at 80 RPMs / 3.7 knots (with a corresponding thrust of over 13,000 Horsepower).

90.   Tug Interests' hydrodynamic expert Prof. Charles Munsch illustrated this point at trial.  He testified that the "turning moment" applied by two tugboats must overcome a ship's resistance to rotational motion in order to turn a ship being towed.  He further testified that the ability of the tugs to turn a vessel necessarily depends upon the size and speed of the vessel being towed, as well as the size and speed of the tugboats.  Prof. Munsch added

37

that in relation to the "turning point" concept, it is important to consider the towed vessel's "pivot point," which is the invisible point at which the vessel turns.  The pivot point will move forward and aft based upon the vessel's own forward and astern speed, the vessel's rudder angle, and also (where applicable) the speed, thrust and rudder angle of the tugboats assisting the Vessel.

91.    In this instance, Prof. Munsch determined the thrust power delivered to the AFRAMAX's propeller at 30 RPMs is approximately 2,900 Horsepower.  However, the thrust power delivered to the AFRAMAX's propeller at 80 RPMs is approximately 13,000 Horsepower.  He opined that at a speed of 80 RPMs, the effectiveness of the tugs' turning moment upon the AFRAMAX would have been severely reduced.  Specifically, the pivot point of the AFRAMAX would move aft, which would have increased the effectiveness of the forward tug (GASPARILLA) but decreased the effectiveness of the aft tug (JESS NEWTON).  Moreover, such a speed would require the tugs to apply a "side thrust" from their own engines in order to maintain each tug's perpendicular position on the ship.  In both instances, the shifting pivot point to stern and the increasing astern speed of the AFRAMAX would reduce the perpendicular thrust that each tug could have used to turn the ship.  He further calculated that at 3.7 knots under the conditions at issue, the Tug's bollard pull strengths would have been reduced by 71.9 %, given the size and thrust capabilities of each vessel in relation to the other.  He concluded that the aft motion of the AFRAMAX

38

caused the turning moment applied by the tugs to be significantly reduced and less than expected, and that the reduction of the tugs' effective thrust during the departure evolution due to the over-speeding of the AFRAMAX's engine likely prevented the tugs from using the full measure of their thrust capabilities as intended. The Court finds Prof. Munsch's testimony to be credible, and it supports Tug Interests' position that the tugs were prevented from accomplishing the turn as a direct result of the AFRAMAX's over-speeding Engine.

**iv**  **_The GASPARILLA and JESS NEWTON Had No Duty to Intervene in Pilot McGee's Orchestration of the Departure Maneuver_**

92.  ARM argued at trial that the GASPARILLA and JESS NEWTON should have each taken separate, independent actions to assist the AFRAMAX in potentially avoiding the allision. However, AFRAMAX misconstrues the scope of the Tugs' duties in this unique vessel-assist situation.

93.  In the first instance, the tugs were under no duty to offer their opinions to Pilot McGee during the departure evolution or even after it became apparent that a risk of allision was unfolding. The case of _Virginia Intern. Terminals, Inc. v. M/V KATSURAGI_, 263 F. Supp. 2d 1035, 1038. (E.D. Va. Jan. 10, 2003) illustrates this point. In _Virginia Terminals_, a pilot at the helm of a container ship was making arrangements to berth at a pier in Norfolk, Virginia with the assistance of two tugs. However, the vessel allied with a pier due to its speed. _Id_. at 1033. The vessel argued that captain of the tug closest to the allision "should have communicated to the ship his concern

that its speed was too fast." *Id*. at 1038. The Court disagreed, and summarized the scope of the tug captain's general duty as follows:

> [I]t is not the tug captain's place to weigh in with his opinion regarding how the maneuver is being conducted. In fact, he is, generally, supposed to keep the line of communication clear to allow the captain to issue his orders. The tug captain is there, essentially, to follow orders, and he normally will not have the experience or perspective to judge when a maneuver is being improperly conducted. There were two observing experts on the bridge authorized to intervene at any time they felt the docking pilot was acting in an unsafe manner — the state pilot and the ship's captain. It is not incumbent upon a tugboat captain to warn of conditions that are known to the ship's officers and docking pilot, such as its speed. Finally, the evidence is unclear as to whether the KATSURAGI was even proceeding at an unreasonably excessive speed. No duty exists on the part of the assisting tugboat to inform the docking pilot of his opinions under the set of facts present in this case. *Id*.

94.     This rationale can be directly applied here: the Court determines that neither the GASPARILLA or JESS NEWTON were under any obligation or duty to do anything other than to follow Pilot McGee's orders during the departure evolution – which they did.

95.     "Assist tugs are to follow the orders of others **rather than taking action on their own accord** …" See *Crowley American Transport, Inc. v. Double Eagle Marine, Inc.*, 208 F. Supp. 2d 1250, 1267 (S.D. Ala. Apr. 4, 2002)(with emphasis added). In fact, assist tugs can be held liable in instances where they "proceed on their own initiative." See *Great Lakes Towing Co. v. Am. S.S. Co.*, 165 F.2d 368, 371 (6th Cir. 1948) (holding the ship liable for inadequately reporting the ship's proximity to a buoy, and the tug jointly liable because the tug "proceeded on its own initiative without requesting direction or furnishing an opportunity for direction to be

given" thus towing the ship too fast astern.).   JESS NEWTON Mate

Arduengo emphasized these principles when he testified that:

> *We follow the orders of the pilot.  It is not my place to do things against what the pilot says.  The pilot has the full view of the job.  I only have my little piece of the job.  So if I start doing things that he is not aware of, it could become potentially more dangerous.*
>
> . . .
>
> *I trust that the pilots are working on the problem.  I can tell they are working on the problem.  If I do anything other than what they tell me, it could exacerbate the problem.*  Tug Ex. 195, Arduengo Depo, Pgs. 71-72.

96.     *Osprey Ship Management, Inc. v. Jackson County Port Authority*, 2007 WL

4287708 (S.D. Ala. Dec. 4, 2007) illustrates this point.  In *Osprey*, a large

heavy-lift vessel was making arrangements to berth in Pascagoula,

Mississippi.  Her pilot ordered two assist tugs to help with the berthing

evolution.  *Id*. at *1.  Both tugs connected to the vessel, but the flotilla later

allided with a submerged object, damaging the vessel.  Vessel interests sued

the tugs, claiming among other things that they failed to properly perform

their obligations in docking the vessel.  *Id*. at *3.  In that regard, vessel

interests argued that the tugs had a duty under both Rules 2 and 7 to "use

all available means" to determine and avoid risk of collision, and that such

an independent duty in the tug-assist scenario would be in accordance  with

"ordinary practices of good seamanship."[10]  *Id*. at *7.  However, the Court

disagreed, and noted that the vessel failed to offer "persuasive authority for

the proposition that the responsibility for the navigation of a vessel should

---

[10] This argument would necessarily implicate Rule 8 as well.

148906.06501/127410267v.2

be shifted from the pilot and master of the vessel to tugboats that are simply

following their orders."  *Id*.

97.     That conclusion fits perfectly here. The Court determines that under the

unique facts and special circumstances of this particular case, Tug Interests

were under no obligation to notify AFRAMAX of the unfolding situation

or to take distinct measures to avoid the allision.

> *v        The Tugs Were Placed In Extremis As a Result of AFRAMAX's
> Malfunctioning Governor Actuator and her Crew's Failure to
> Promptly Respond to the Emergency*

98.     "Where, without prior negligence, a vessel is put in the very center of

destructive natural forces and a hard choice between competing courses

must be immediately made, the law requires that there by something more

than mere mistake of judgment by the master in that decision in extremis."

*Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84 (5th Cir. 1960).  Under

this principle, even if the Court were to determine that the GASPARILLA

and /or JESS NEWTON committed a mistake of judgment (which is not the

case), the Court would otherwise consider the actions of the Tugs to have

been made *in extremis* due to the actions caused by the AFRAMAX in

failing to take control of her over-speeding Engine.

99.     Specifically, the Court notes that shortly before the allision, JESS

NEWTON Mate Arduengo informed Pilot McGee that he would "have to

stop pulling" the AFRAMAX due to the nearest approaching dolphin, and

also because he was concerned for the safety of the JESS NEWTON and

her crew.  Mate Arduengo thereafter testified that he was unable to comply

with  Pilot  McGee's  last  requested  order  to  "come  ahead"  on  the

AFRAMAX because it would have been "impossible" to do so by that time, as the safety of his tug "was in harm's way". Tug Ex. 195, Arduengo Depo., Pg. 114. Pilot McGee did not fault Mate Arduengo under the circumstances - he actually applauded Mate Arduengo's efforts during the entire departure sequence, under the circumstances. Tug Ex. 192, McGee Depo, Pg. 28. The Court determines that Mate Arduengo's rejection of Pilot McGee's last order was not a contributing factor to the allision. It would otherwise be construed as *in extremis*. *See Puerto Rico Ports Auth. v. M/V MANHATTAN PRINCE*, 897 F.2d 1 (1st Cir. 1990)(holding in extremis doctrine applied to tug when it was forced to release lines from tanker to avoid being sandwiched between tanker and dock shortly before collision). *See also Compagnie Generale Transatlantique v. Venhorst*, 1973 WL 6392549 (S.D. NY. Sept. 18, 1973)("It would be particularly unfair in this instance to fault the action of the tug's mate since it was the imprudence of the master of the ship which caused the tug and the ship to be faced with the critical situation in which the vessels and crew found themselves in at the time of the accident in question.").

E.    **ARM's Alleged Damages**[11]

100.    "The general rule for recovery of damages due to the negligence of others in admiralty cases is *restitutio in integrum*; the damaged party is entitled to be put in as good a position pecuniarily as he was in prior to the damage to

---

[11] Section E(i-ii) is included by Tug Interests solely to address statements of fact pertaining to Aframax's alleged damages in the event the Court determines that Tug Interests bear some responsibility for the allision, which Tug Interests submit is unwarranted given the facts surrounding the incident and the legal positions asserted by Tug Interests.

his property occurring." *BP Expl. & Oil, Inc. v. Moran Mid-Atl. Corp.*, 147 F. Supp. 2d 333, 337 (D.N.J. 2001) (citing *The Baltimore*, 75 U.S. (8 Wall.) 377 (1869); *Standard Oil Co. v. S. Pac. Co.*, 268 U.S. 146 (1925)).

101.   "A party in admiralty can have a legal duty to mitigate damages …" *Am. Mill. Co. v. Tr. of Distribution Tr.*, 623 F.3d 570, 575 (8th Cir. 2010) (citing *The Baltimore*, 75 U.S. 377, 387 (1869)).  Sometimes also referred to as the doctrine of avoidable consequences, this rule provides that "a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them." *Pennzoil Prod. Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1474 (5th Cir. 1991), quoting *Southport Transit Co. v. Avondale Marine Ways, Inc.*, 234 F.2d 947 (5th Cir. 1956).

i.     **AFRAMAX's Alleged Physical Damages**

102.   "[T]he measure of damages in collision is the difference in value between the ship before and after the collision, but the cost of the necessary repairs and the loss of earnings while they are being made have long been regarded as its equivalent." *Pan-Am. Petroleum & Transp. Co. v. United States*, 27 F.2d 684, 684 (2d Cir. 1928) (L. Hand, J.).  See also *Gaines Towing & Transp., Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999) ("When a damaged vessel is not a total loss, the owner is entitled to recover the reasonable cost of repairs necessary to restore it to its pre-casualty condition."

103.   Many of ARM's physical damage claims appear to be unsubstantiated or otherwise not proximately related to the incident at issue.

104.   For example, ARM has claimed that Tug Interests are responsible for paying for the replacement parts for the Governor Actuator and associated equipment, along with the Nabtesco technician's costs, totaling $57,401. Tug Ex. 198, Verveniotis Depo., Pgs. 7-11, citing to Nabestco Invoices. However, ARM has conceded that Tug Interests are not responsible for the failure of the Governor Actuator and associated equipment.  Tug Ex. 197, Cherukuri Depo Pgs. 73.  As such, these costs are excluded outright from the alleged damages which ARM has asserted against Tug Interests.

105.   ARM has also claimed that Tug Interests are responsible for repairs done to the Main Engine (at a cost of $14,597), along with multiple surveyors' costs with respect to this piece of equipment.  Tug Ex. 86 (Diesel United Invoice); Tug Ex. 105 (Class invoices).  Again, ARM has conceded that Tug Interests are not responsible for the failure of the Main Engine.  Tug Ex. 197, Cherukuri Depo Pgs. 74-75.  As such, these costs are also excluded outright from the alleged damages which ARM has asserted against Tug Interests.

106.   Based upon the above, the total amount of ARM's physical damages directly related to the incident are determined by the Court to be $_____.

**ii.     AFRAMAX's Alleged Economic Damages**

107.   The owner of a vessel detained for repairs may recover damages for loss of use of its vessel during repairs, but it must show that it suffered some actual

148906.06501/127410267v.2

pecuniary loss as a result of loss of use of the vessel. *Brooklyn Eastern Dist. Terminal v. United States*, 287 U.S. 170 (1932); *Prudential Lines Inc. v. McAllister Bros. Inc.*, 801 F.2d 616 (2nd Cir. 1986).

108.   "Loss of profits or the use of a vessel pending repairs, commonly called 'demurrage,' is recoverable, provided there be an actual loss." *Mon River Towing, Inc. v. Indus. Terminal & Salvage Co.*, No. CIV.A 06-1499, 2009 WL 904701, at *9 (W.D. Pa. Mar. 31, 2009). However, it does not appear that claims for loss of earning capacity by a vessel following the successful completion of repairs are compensable in collision/allision cases – "[l]oss of earning capacity claims in maritime law typically refer to loss of wage earning capacity by seamen suffering personal injury or death while engaged in maritime activities." *Id*. at *9, n. 17 (citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533, n. 8 (1983)).

109.   Where freight or charter hire may vary from voyage to voyage, expected income may be averaged pursuant to the "three voyage rule" described in *Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F. Supp. 642 (S.D. Tex. 1990), in which the vessel's income for the voyage immediately preceding the collision, the voyage of the casualty, and the first voyage after repairs are completed, are averaged to determine an appropriate rate to measure loss of income during the period of repairs. See also *Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140 (5th Cir. 1994) (approving use of "three voyage rule").

110.   ARM's alleged economic losses from the incident are also unsubstantiated.

148906.06501/127410267v.2

111.    For example, ARM has claimed "economic losses" of over $1,174,632.46 from Sept. 6, 2016 through Dec. 29, 2016 purportedly as a result of the Vessel being rejected from her commercial trading pool (Navig8) following the incident.  However, ARM testified that the rejection from the Pool was "automatic," and could have been for a multitude of reasons.  Tug Ex. 199, Mitsotakis Depo., Pgs. 18-24.  Moreover, ARM has offered no evidence that the reason for the Vessel's rejection was specifically due to the actions or inactions of Tug Interests.  *Id.*

112.    ARM has also failed to support entitlement to economic damages in accordance with the three-day voyage rule. It has not provided any evidence as to the Vessel's income for the voyage immediately preceding the casualty or the voyage of the casualty, and has only provided evidence of the Vessel's income for the first voyage after the repairs were complete (which ARM claims was $69,133.33 before expenses). Under the circumstances, ARM has failed to establish an appropriate rate to measure the loss of income during the period of repairs from Sept. 6, 2016 through Oct. 16, 2016.

113.    Regardless, at trial Tug Interests highlighted evidence demonstrating that as early as Oct. 6, 2016, one of ARM's clients – Shell – had confirmed that the AFRAMAX was "currently eligible for consideration for Shell business." Tug Ex. 98, AMR 16066.  It is therefore inappropriate for ARM to seek economic damages beyond Oct. 6, 2016, as the vessel was potentially eligible for hire to third parties.  In any event, ARM's attempt to seek

47

damages from Oct. 6, 2016 through July 20, 2020 is a clear breach of its independent duty to mitigate damages.

114.   Based upon the above, the total amount of ARM's economic damages directly related to the incident are determined by the Court to be $_____.

## V.   CONCLUSION

115.   Having considered the evidence, arguments of counsel at trial, and applicable law, the Court finds that the AFRAMAX RIVER 100% responsible for the allision with the ITC Dolphins, and that the GASPARILLA and JESS NEWTON are not responsibe for the allision. Accordingly, ARM is not entitled to recover any damages from Tug Interests.

116.   The Court will enter a final judgment consistent with these findings of fact and conclusions of law.

Respectfully Submitted,

BLANK ROME LLP

*/s/ Jeremy A. Herschaft*
Jeremy A. Herschaft (Attorney-In-Charge)
State Bar No. 24091970
Fed. I.D. No. 1450990
Michael K. Bell
Tx State Bar No. 02081200
Fed. I.D. No. 5085
Emery G. Richards
State Bar No. 24093038
Fed. I.D. No. 2487379
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone: (713) 228-6601
Facsimile: (713) 228-6605

148906.06501/127410267v.2

jherschaft@blankrome.com
mbell@blankrome.com
emery.richards@blankrome.com

***ATTORNEYS FOR THIRD-PARTY DEFENDANTS,*** Suderman & Young Towing Company and G&H Towing Company

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was served pursuant to Federal Rule of Civil Procedure 5 on all counsel and/or parties of record on this 12th day of August, 2022.

*/s/ Jeremy A. Herschaft*
Jeremy A. Herschaft

148906.06501/127410267v.2