IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **INTERCONTINENTAL TERMINALS CORPORATION, LLC** § § § § | | |
| Plaintiff, | | |
| v. | § § | **C.A. NO. 4:18-cv-3113** **RULE 9(h) - ADMIRALTY** |
| **AFRAMAX RIVER MARINE CO., EXECUTIVE SHIP MANAGEMENT PTE LTD., M/T AFRAMAX RIVER** § § § § | | |
| Defendants / Third-Party Plaintiffs, | | |
| v. | § § § | |
| **SUDERMAN & YOUNG TOWING COMPANY, G&H TOWING COMPANY And SEABULK TOWING SERVICES, INC.** § § § § § | | |
| Third-Party Defendants. | | |

### THIRD PARTY PLAINTIFFS' PRE-TRIAL PROPOSED CONCLUSIONS OF LAW

Comes now Third-Party Plaintiff Aframax River Marine Co. ("ARM"), and Executive Ship Management Pte. Ltd. ("ESM") by and through undersigned counsel, and files this Pre-Trial Proposed Conclusions of Law as follows:

1. This is a case of admiralty and maritime jurisdiction, as well as an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. 28 U.S.C. § 1333; Fed. R. Civ. P. 9(h).

2. The party claiming damages in this case is Aframax Rive Marine Co., the registered owner of the crude oil carrier tanker AFAMAX RIVER, who possessed the property ownership over this vessel.

1

3. The operator of the AFRAMAX RIVER who was responsible for its safety management under the International Safety Management Code Art. 1.1.2 at all times material hereto was Executive Ship Management Pte. Ltd.78 Shenton Way, # 21-00/22-00 Singapore 079120 SINGAPORE. See 46 U.S.C.S. § 3201 *et seq.*; 33 C.F.R. § 96.110 et seq.

4. The relationship of the AFRAMAX RIVER to the tugs GASPARILLA and JESS NEWTON was that of a tow to her assisting tugs. As in this case, "...the tow may have its own power—such as cruise ships or tankers being towed into a harbor—but the ship being towed is designated as the "tow" precisely because it receives auxiliary motive power from the tug or towing vessel." *Continental Insurance Co. v. L&L Marine Transportation, Inc*., 882 F.3d 566, 571 (5th Cir. 2018)

5. "It is settled law in this country that a tug, under the ordinary towage contract, is not the agent or servant of the tow in performing the service, but is an independent contractor; and consequently that the tow is not liable, upon the rule respondent superior, for any loss occasioned by the faulty navigation of the tug." *The Express*, 52 F. 890, 892 (2d Cir. 1892); *United States v. Port of Portland* 1924 AMC 1154, 1157 (9TH Cir. 1924)

6. "When a maritime collision occurs which involves a tug and tow, the courts have developed the concept of the "dominant mind" in order to impose liability for the collision on the tug for faults in navigation, even though the tow may have contributed to the problem. Thus, only that vessel is liable whose people are actually in control of the operation in which the flotilla as a whole is cast in fault." *Chevron U.S.A. , Inc. v. Progress Marine, Inc*. 1980 AMC 1637 AT 1638; aff'd, 632 F.2d 893 (5th Cir. 1980).

7. In a docking or undocking maneuver with a pilot on board and the assistance of harbor tugs, the tugs are responsible and act independently in so far as their assigned duty or part

of the maneuver is concerned. *International Terminal Operating Co. v. Naviera Aznar, S. A.*, 198 F. Supp. 214, 217 (S.D.N.Y. 1961) (citing *The Edward G. Murray*, 278 F, 895, 897 (2nd Cir. 1922).

8. Assisting tugs are liable for their own negligent acts in taking such a wrong positioning with reference to the assisted vessel as to render themselves useless; and thereby cause the collision. *The Edward G. Murray*, 278 F. 895, 897 (2d Cir. 1922).

9. The tug is not liable as an insurer or as a common carrier but owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services. *Stall & McDermott v. The Southern Cross*, 196 F.2d 309,311 (5th Cir. 1952).

10. The relationship of assisting tugs and assisted vessel, though contractually based, in terms of the respective liabilities of the parties to one another for loss or damage caused in the course of the execution of the assisted ship maneuvering is governed by principles of negligence. *Posavina Shipping Co. v. Alex C Corp. (In re Alex C Corp.)*, 2010 U.S. Dist. LEXIS 116381 at *24 (D. Mass. Nov. 1, 2010); and unseaworthiness. *The Enterprise,* 228 F 131, 137 (D. Conn. 1915).

11. A suit by the owner of a tow against her tug, to recover for an injury to the tow by negligence on the part of the tug, is a suit ex delicto and not ex contractu. The *John G. Stevens* 170 U.S. 113, 125 (1898). These principles governed the relationship of the tugs JESS NEWTON and GASPARILLA to the AFRAMAX RIVER at all relevant times.

12. "The analysis of a maritime tort is guided by general principles of negligence law. *Casaceli v. Martech Int'l., Inc*., 774 F.2d 1322 (5th Cir.1985); *Daigle v. Point Landing, Inc*., 616 F.2d 825 (5th Cir.1980). Under these principles a tortfeasor is accountable only to those to

3

whom a duty is owed." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65,67 (5th Cir. 1987).  The tugs of the Third Party Defendants, having undertaken to assist the undocking and backing into the channel maneuver of the AFRAMAX RIVER, had a duty to exercise due care in providing their services.

13. The duty to exercise due care in the circumstances of the undocking and backing into the channel maneuver involved several components.  One such obvious component was for the pilots and tugs to communicate before undertaking such a maneuver so that they were coordinated as what was to be done and how.  See e.g., *Houston Fuel Oil Terminal Co. v. M/N City of Akaki*, 1996 U.S. App. LEXIS 452508 at * 2 (5th Cir. 1996); *see also Folkstone Maritime v. CSX Corp.*, 1994 U.S. Dist. LEXIS 3410 *49 (N.D. Ill. Mar. 25, 1994).

14. An important part of the work to be done by the tugs in assisting a vessel to undock and maneuver into the outbound lane of the Houston Ship Channel was the proper "making up" of the tugs with reference to the hull of the AFRAMAX RIVER.

15. The positioning of a tug in assisting a vessel is the responsibility of the tug master.  If he positions the tug in relation to the vessel assisted is the wrong position and it causes damage to the vessel, the tug is liable.  See *The Edward G. Murray*, 278 F. 895, 897 (2d Cir. 1922).

16. It is not for the master or for the pilot to instruct the tug master where is the proper placement of the tug assisting the vessel.  *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1453 (E.D. Va. 1996).  The owner of the vessel is entitled to rely upon the expertise of a tug captain in docking and undocking maneuvers. *Id.*

17. While the rule in the Fifth Circuit is that the tug master must follow the maneuver orders of the pilot in charge of the navigation of the vessel (*In re Marquette Transportation Co.*

*Gulf Inland, LLC*, 2021 U.S. Dist. LEXIS 238989 at *12(W.D. La. Dec. 14, 2021), this does not absolve the tug from liability for failing to warn the pilot of the tugs inability to carry out the pilot's orders and give adequate time to the pilot to avoid collision/allision. *Houston Fuel Oil Terminal Co. v. M/N City of Akaki*, 1996 U.S. App. LEXIS 452508 at * 4-5(5th Cir. 1996); see also *Chitty v. M/V Valley Voyager*, 408 F.2d 1354, 1357 (5th Cir. 1969).

18. The operator of a tug in rendering its services warrants to the towed vessel the seaworthiness of its tug. " [I]n in a contract of towage there is an implied obligation that the tug shall be efficient and properly equipped for the service, provided, of course, that the breakdown did not arise from causes which ordinary care could have discovered and prevented." *The Enterprise*, 228 F. 131, 137 (D. Conn. 1915).

19. "In a contract of towage, the towing company undertakes that it possesses sufficient knowledge and skill to perform the contract safely; that it will use its best endeavors, skill and diligence for that purpose; that it will provide a seaworthy vessel, properly equipped and manned, and of sufficient capacity and power to perform the task undertaken, under conditions which are to be reasonably anticipated." *River Parishes Co. v. M/V Flag Adrienne*, 2002 U.S. Dist. LEXIS 12232 at *12 (E.D. La. July 1, 2002).

20. A seaworthy vessel is one that is "reasonably fit for its intended use…The focus is on whether the vessel as equipped was reasonably capable of performing the intended mission if properly operated." *Posavina Shipping Co. v. Alex C Corp. (In re Alex C Corp.)*, 2010 U.S. Dist. LEXIS 116381 *31 (D.MA. 2010) (citing *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 13 (5th Cir. 1976)).

21. "The failure of a tug's machinery or gear is within the class of cases where the facts are peculiarly within the knowledge of the tug owner who must explain the occurrence or be held liable for the resulting damages.  The duty extends not only to disclosing what happened, but what was done to avoid, and what would have been necessary to prevent the failure of the tug's machinery or gear." *River Parishes Co. v. M/V Flag Adrienne*, 2002 U.S. Dist. LEXIS 12232 at * 13(E.D. La. July 1, 2002).

22. The tugs failed to exercise due care in the circumstances of the undocking and backing into the channel maneuver in failing to have a briefing with the pilots beforehand. It was assumed that the tugs having performed the same maneuver several times before, there was no need to coordinate at all in this regard.  Even when the risk of the allision became great concern during the course of the maneuver Mate Arduengo of the JESS NEWTON assumed the maneuver was going to work out and considered that it was not his place to alert the pilot about his concerns about his perceived risk of an allision.

23. The aft positioned tug, JESS NEWTON, failed to exercise due care in the circumstances with reference to the part of the AFRAMAX RIVER where her crew made her up for purpose of assisting the AFRAMAX RIVER to turn her stern clockwise to enter the outbound lane of the Houston Ship Channel.  Tug master Curry and, subsequently, Mate Arduengo, who was in charge of her navigation, undertook the towage with the JESS NEWTON's hawser attached a considerable distance forward from the aft port quarter fairlead where she should have been attached.  The position where the towing hawser was actually attached by the JESS NEWTON was considerably forward of the Vessel's accommodation at approximately some 70 meters ahead from from her aft port quarter fairlead.  The point of attachment was at or near the AFRAMAX RIVER pivot point as she

lay still. This virtually guaranteed that with the commencement of the backing out maneuver, the pivot point would shift sternward, thus cancelling out, or greatly reducing, the lever that the aft tug might have exerted in order to provide the turning moment needed to effectively turn into the Houston ship channel.

24. The negligent failure of the JESS NEWTON to attach her hawser at the proper point onboard the AFRAMAX RIVER was one of the principal causes of the inability of this tug to perform the simple task assigned to her - turn the stern of the AFRAMAX RIVER clockwise.

25. Apart from what is evident negligence on the part of the JESS NEWTON in attaching her hawser through the wrong fairlead of the AFRAMAX RIVER, the record shows yet another reason why this tug was unable and unwilling to attach her hawser at the port quarter fairlead (situated at approximately Frame 09 on the port side of the AFRAMAX RIVER). Mate Arduengo's deposition evidence is that the configuration of the JESS NEWTON was such that she was impeded by the vessel's counter (the curvature of the hull in way of the vessel's port quarter) from taking that position. Mate Arduengo was concerned that if the JESS NEWTON needed to act as a push-tug at that position she would have been precluded from doing so by reason of her own structure. Mate Arduengo's deposition testimony, was that if the other tug, the GASPARILLA, was to be the aft tug, her structure would not have prevented her from attaching at the port quarter fairlead. The unsuitability of the JESS NEWTON to attach her towing hawser through a fairlead that would have allowed her to perform more efficiently made this tug not reasonably fit for her intended use. i.e. unseaworthy. The tug throughout the course of the maneuver, failed

7

to provide the necessary turning moment needed to effectively position the vessel in the outbound lane of the Houston Ship Channel.

26. On the other hand, the tug GASPARILLA, was by reason of her structure well suited to serve as a push-pull tug if she was attached to the port quarter fairlead, and would have provided approximately 1,000 additional horsepower for turning the stern of the AFRAMAX RIVER clockwise.  However, she was incapable of serving as the aft tug in the area of the vessel's port quarter because her towing winch was out of order, and she was unable to control the length and tension of her hawser as she was forced to deploy it "conventional", and this would have posed a risk of having it fouled with the propeller of the AFRAMAX RIVER.  By reason of her unseaworthiness in lacking an operable towing winch the GASPARILLA was incapable of providing effective assistance.  She was not adequately equipped for the intended service and was, therefore, unseaworthy.

27. The GASPARILLA was also unseaworthy and not suited to serve as the aft tug by reason of her lack of forward fendering that prevented her from being deployed by Third Party Defendants as the aft tug, likely to be used as a pull-push tug in an area of the hull of the AFRAMAX RIVER  where her bunker tanks were located which would created a risk of metal to metal contact and a risk of puncture of the shell plating of the AFRAMAX RIVER.

28. The unseaworthiness of the two tugs combined proximately caused their inability to provide the AFRAMAX RIVER with the steering the Third Party Defendants were required to provide in order to safely  turn and position the vessel in the outbound lane of the Houston Ship Channel.

29. While engaged in providing her services to the AFRAMAX RIVER and in the course of towage the tug JESS NEWTON suffered a mechanical breakdown of her towing winch

that rendered her incapable of effectively controlling her hawser and effectively assisting the AFRAMAX RIVER to make her turn into the Houston Ship Channel. The breakdown purportedly in the direction control valve of the winch rendered the winch ineffective and/or inoperable and the JESS NEWTON unseaworthy.

30. The near contemporaneous documentary evidence generated by Third Party Defendants in the form of incident reports of the crew, and contemporaneous electronic video recordings bear out and strongly support the inference of a causal relationship of the mechanical breakdown of the towing winch and the consequent failure of the JESS NEWTON to generate the necessary turning moment needed to rotate the stern of the AFRAMAX RIVER clockwise.

31. The unseaworthiness of the JESS NEWTON's towing winch that manifested itself in the course of the towage was a concurrent proximate cause of the allision.

32. Assist tugs have a duty to "promptly execute the orders of the tow's commander or here, the person in charge of the [piloted vessel]." *Bisso v. Waterways Transp. Co.*, 235 F.2d 741, 746 (5th Cir. 1956). "Chaos would indeed prevail if a helper tug either did, or felt under compulsion to determine, what that tug from its limited point of view thought ought to be done." *Bisso*, 235 F.2d at 746 (citing *Moran Towing & Transportation Co. v. Empresa, Hondurena de Vapores*, 31 F.2d 963 (5th Cir. 1929)).

33. Moreover "Tugs, when taking other vessels in tow, are bound to use ordinary care and diligence in taking up and managing the tow according to the exigencies of the business. They have the full government and care of the vessel towed. *The Quickstep*, 9 Wall. 670. They cannot abandon the safety of interests intrusted to them for slight causes, or on account of even ordinary obstacles, and excuse themselves. The causes must be ample, and

the obstacles in the way of performance must be at least of an extraordinary character, if not absolutely insurmountable." *The W. J. Keyser*, 56 F. 731, 734 (5th Cir. 1893); see also *The Joseph F. Clinton*, 250 F. 977,979 (2d Cir. 1918) ([A] tug is bound by the contract of towage not to abandon both tow and contract when the former gets into trouble, until the reasonable resources of good seamanship are exhausted.  The tug's engagement is usually, as here, to take the tow from one place to another in a skillful manner…and when danger arises, the tow cannot be abandoned until all reasonable efforts for its preservation have been exhausted")).

34. The failure of the JESS NEWTON to obey the pilots orders to "come ahead" on the AFRAMAX RIVER, and indeed the out and out refusal of Mate Arduengo who was in charge of her navigation to obey the pilot's order (*"*I can't come ahead on it now" and "All right, I am out") was the last opportunity the AFRAMAX RIVER had to avert contact with the ITC mooring dolphins, and as such, it is chargeable to the JESS NEWTON as a substantial cause of the allision.  This is so not only because the JESS NEWTON was required to obey the pilot's orders and not take action on his own, but also because G&H acting by its employee Mate Arduengo abandoned the AFRAMAX RIVER and did not even make an attempt to push her port quarter away from the ITC mooring dolphins that punctured her hull and bunker tank.

I. **Apportionment of Liability**

35. "Comparative fault is used to apportion liability in maritime cases when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding." *U.S. v. Reliable Transfer Co*., 421 U.S. 397, 411, 95 S. Ct. 1708, 44 L. Ed. 2d 251 (1975). "[L]iability for such damage is to be allocated among the parties

proportionately to the comparative degree of their fault…." *Id.* Further, the United States Court of Appeals for the Fifth Circuit recognized that "the Supreme Court abandoned the archaic concept of tort indemnity and replaced it with the doctrine of comparative fault." *Pierce v. Five B's, Inc.*, 2008 U.S. Dist. LEXIS 65530 at *4 (E.D. La. Aug. 27, 2008).

36. "[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, the Supreme Court has instructed liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." "*Impala Terminals Burnside LLC v. Marquette Transportation Co.*, 2021 U.S. Dist. LEXIS 55579 *11 (E.D. La. Mar. 24, 2021)  (*quoting United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411, 95 S. Ct. 1708, 44 L. Ed. 2d 251 (1975).)

## II.     Damages - Cost of Repairs

37. "Strictly the measure of damages in collision is the difference in value between the ship before and after the collision, but the cost of the necessary repairs and the loss of earnings while they are being made have long been regarded as its equivalent. As to the loss of earnings, it may be that the owner makes a prima facie case when he proves his actual loss by reason of the lay-up.' And the rule as stated by this Court  is this: 'The maxim 'Restitutio in integrum,' applies in awarding damages in collision cases, and there is no doubt that the owner of a vessel may recover as damages an amount necessary to restore her to her condition before the accident, whether the repairs are actually made or not, if the value of the vessel is thereby decreased.'" *Miami v. Western Shipping & Trading Co.*, 232 F.2d 847, 851 (5th Cir. 1956).

38. The owner of a vessel damaged as a result of collision is entitled to make the repairs that are immediately necessary and these are properly recoverable. *Cape Bille Shipping Co. v. Tug Judy Moran,* 2007 U.S. Dist. LEXIS 74671*29 (S.D.N.Y. Aug. 22, 2007). An "owner's reasonable and good faith decision to make immediate repairs is generally determinative of the issue as to whether repairs were necessary." *Id.*

39. In the case of the AFRAMAX RIVER the owner had no choice but to make the repairs and other replacements for the restoration of the vessel as these were class conditions on the further trading of the vessel.

40. In deciding whether the cost of repairs to the damaged vessel are reasonable the court "will allow the injured party a wide latitude in determining how best to deal with the situation." *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 933 (5th Cir. 1979). In any event "[t]he burden of showing that the victim of tortious conduct failed to minimize his damages rests with the wrongdoer."

41. There is no evidence that has been put forth by the Third Party Defendants showing that the cost of repairs, associated expenses, and other costs incurred in restoring the AFRAMAX RIVER to the status of a tanker vessel capable of trading was not reasonable.

42. Maritime law permits parties to recover money damages resulting from a collision caused by the negligence of another party. Damages include the cost of vessel repair, loss of use, out-of-pocket costs of wreckage and cargo removal, salvage, drydocking, and caring for the damaged vessel." *Kirby Inland Marine v. FPG Shipholding Co.,* 548 F. Supp. 3d 613, 626 (S.D. Tex. 2021). Pollution response damages incurred by the owners of the damaged vessel are also recoverable from the party at fault.

43. Third Party Plaintiff incurred the following losses, liabilities, and costs for the post casualty preservation, repair, and restoration of the AFRAMAX RIVER, and for the oil pollution cleanup and response and civil fines assessed for pollution totaled USD 1,735,490.47.

## III. **Damages-Lost Profits**

44. "That the loss of profits or of the use of a vessel pending repairs or other detention, arising from a collision, or other maritime tort, and commonly spoken of as demurrage, is a proper element of damage, is too well settled both in England and America to be open to question." *The Conqueror*, 166 U.S. 110, 125 (1897*); Graham v. PCL Civil Constructors, Inc*., 2013 U.S. Dist. LEXIS 179688 at * 14-15 (S.D. Tex. Dec. 23, 2013).

45. "Lost profits during a repair period can be determined by "'a simple calculation based upon the number of days the [vessel] was out of service . . . multiplied by the average daily lost profits for the vessel.' From this gross figure must be subtracted the ordinary expenses the shipowner would incur in operating his vessel to ascertain the owner's net profit." *Graham v. PCL Civil Constructors, Inc*., 2013 U.S. Dist. LEXIS 179688 * 15(S.D. Tex. Dec. 23, 2013).

46. If, in conducting repairs a vessel is laid up and she does not incur such running costs as crew wages, victualing, fresh water and bunkers consumption, such costs may be deducted from the recovery of damages for lost profits. However, if such costs have continued to be incurred by the owners during the repair period, they may not be deducted from damages. *Skou v. United States*, 478 F.2d 343, 357-348 (5th Cir. 1973**)**.

47. From the time of the allision incident, through completion of repairs and restoration of the AFRAMAX RIVER to class, the vessel maintained onboard a full crew and consumed bunkers. These costs, accordingly, may not be deducted from damages.

48. Third Party Plaintiff has made a claim for lost profits during the vessel's repair period that shows the vessel had been employed steadily since 2012 in the Navig8 V8 Pool which shows net daily time charter-equivalent of $ 15,828.49 per day in the third quarter of 2016. This for the period that the vessel remained idle by reason of repairs together with the cost of the bunkers consumed, that would have been otherwise paid-for by the employment in the pool, was the total amount of $ 759,832.96.

49. The earnings of the AFRAMAX RIVER owners at the time of the allision, and for the foreseeable future was their share from the vessel's participation in the Navig8 V8-Aframax Pool which is a revenue sharing pool of vessels to which Aframax River Marine Co. had participated since 2012.

50. "A tanker pool is a collection of tanker vessels under various ownership, which are placed under the care of a single administrator, known as a pool manager. The pool manager markets the vessels in the tanker pool to those companies interested in hiring vessels to carry cargo, facilitating the employment of each vessel. A pooling agreement is a contract between shipowners or others having rights in vessels to cooperate in the management and operation of all vessels controlled by the group whereby each ship earns from the pool a share in net pool income proportionately with the ship's agreed theoretical earning capacity, as opposed to its actual earnings in the pool. Black's Law Dictionary 1348 (10th ed. 2014). It is essentially the contract used to set up a tanker pool. It typically covers issues such as the objective of the pooling agreement, the authority of the pool managers, the capacity in which the pool managers will act, and the means by which the pool manager will be paid." *United States v. CITGO Asphalt Ref. Co. (In re Frescati Shipping Co.)*, No. 05-cv-305 (JHS), 2016 U.S. Dist. LEXIS 96761 at fn 33 (E.D. Pa. July 25, 2016).

51. A condition of the participation of Plaintiff in the V-8 Aframax Pool was her maintaining her approval by at least 3 major oil companies. *Cape Bille Shipping Co. v. Tug Judy Moran,* 2007 U.S. Dist. LEXIS 74671 at * 20-21(S.D.N.Y. Aug. 22, 2007).

52. In response to reports of the allision, all major oil companies' approvals of the AFRAMAX RIVER were terminated. Thus the vessel was no longer in the pool. Accordingly, for the next three voyages from October to December 29, the Vessel pursued employment outside the pool in order to mitigate its losses while endeavoring to re-enter the V8 pool by obtaining major oil companies' approval. These endeavors to obtain approval by at least three major oil companies to no avail.

53. The AFRAMAX RIVER earnings from trading, following completion of repairs between October 3, 2016 through December 29, 2016 resulted in a net loss of $ 414,799.50, based on the daily payment the vessel would have earned under the V8 Pool of $ 17,197.00 during these dates, expressed as a time charter equivalent.

54. Accordingly the commercial losses of the AFRMAX RIVER from the September 6, 2016 allision until the vessel was able to resume trading after completion of repairs are $1,174,632.46.

## IV. <u>Interest</u>

55. "Pursuant to 28 U.S.C. § 1961, a district court is authorized to award pre-judgment interest upon any recovery of monetary damages. In this Circuit, there is a strong presumption in favor of awarding pre-judgment interest in admiralty cases, and interest generally should only be denied when the plaintiff delays unreasonably in bringing suit…This rate is generally a fixed rate within the discretion of the Court, running from the date of the loss." *Blackwell v. Mid-Stream Fuel Svc*, 2006 U.S. Dist. LEXIS 3387 at * 14-15(E.D. La. Jan.

30, 2006) (citing *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986) (3% pre-judgment interest awarded); *N.D. Shipping, S.A. v. Zagora M/V*, 2009 U.S. Dist. LEXIS 47538 *25-26 (E.D. La. June 5, 2009)).

        Respectfully submitted,

        GAITAS & CHALOS, P.C.

        /s/Jonathan M. Chalos
        George A. Gaitas
        Texas State Bar No. 2405885
        Federal Bar No. 705176
        Jonathan M. Chalos
        State Bar No. 24097482
        Federal Bar No. 3008683
        1980 N Memorial Way
        Houston, Texas 77057
        Tel: (281) 501-1800
        Fax: (832) 962-8178
        gaitas@gkclaw.com
        chalos@gkclaw.com

        ***Counsel for Third-Party Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2022, a copy of the foregoing was served on all counsel and/or parties of record through the Court's cm/ecf system.

        /s/Jonathan M. Chalos

        Jonathan M. Chalos