**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **INTERCONTINENTAL TERMINALS CORPORATION, LLC** **Plaintiff,** | § § § § | |
| **v.** | § § | **C.A. NO. 4:18-cv-3113** **RULE 9(h) - ADMIRALTY** |
| **AFRAMAX RIVER MARINE CO., EXECUTIVE SHIP MANAGEMENT PTE LTD., M/T AFRAMAX RIVER** **Defendants / Third-Party Plaintiffs,** | § § § § § | |
| **v.** | § § § | |
| **SUDERMAN & YOUNG TOWING COMPANY, G&H TOWING COMPANY And SEABULK TOWING SERVICES, INC.** **Third-Party Defendants.** | § § § § § § | |

## <u>THIRD PARTY PLAINTIFFS' POST-TRIAL PROPOSED CONCLUSIONS OF LAW</u>

Comes now Third-Party Plaintiff Aframax River Marine Co. ("ARM"), and Executive Ship

Management Pte. Ltd. ("ESM") (collectively "Vessel Interests") by and through undersigned

counsel, and file this Post-Trial Proposed Conclusions of Law as follows:

1.  This is a case of admiralty and maritime jurisdiction, as well as an admiralty and maritime

    claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. 28 U.S.C. §

    1333; Fed. R. Civ. P. 9(h).

2.  The party claiming damages in this case is Aframax River Marine Co., the registered owner of

    the crude oil carrier tanker AFRAMAX RIVER, who possessed the property ownership over

    this Vessel.

3. The operator of the AFRAMAX RIVER who was responsible for its safety management under the International Safety Management Code Art. 1.1.2 at all times material hereto was Executive Ship Management Pte. Ltd.,78 Shenton Way, # 21-00/22-00 Singapore 079120 SINGAPORE. *See* 46 U.S.C.S. § 3201 *et seq.*; 33 C.F.R. § 96.110 et seq.

4. The relationship of the AFRAMAX RIVER to the tugs GASPARILLA and JESS NEWTON was that of a tow to her assisting tugs. As in this case,  "...the tow may have its own power— such as cruise ships or tankers being towed into a harbor—but the ship being towed is designated as the 'tow' precisely because it receives auxiliary motive power from the tug or towing vessel." *Continental Insurance Co. v. L&L Marine Transportation, Inc*., 882 F.3d 566, 571 (5th Cir. 2018)

5. "It is settled law in this country that a tug, under the ordinary towage contract, is not the agent or servant of the tow in performing the service, but is an independent contractor; and consequently that the tow is not liable, upon the rule respondent superior, for any loss occasioned by the faulty navigation of the tug." *The Express*, 52 F. 890, 892 (2d Cir. 1892); *United States v. Port of Portland* 1924 AMC 1154, 1157 (9TH Cir. 1924).

6. "When a maritime collision occurs which involves a tug and tow, the courts have developed the concept of the "dominant mind" in order to impose liability for the collision on the tug for faults in navigation, even though the tow may have contributed to the problem. Thus, only that vessel is liable whose people are actually in control of the operation in which the flotilla as a whole is cast in fault."  *Chevron U.S.A. , Inc. v. Progress Marine, Inc*. 1980 AMC 1637 AT 1638;  aff'd, 632 F.2d 893 (5th Cir. 1980).

7. In a docking or undocking maneuver with a pilot on board and the assistance of harbor tugs, the tugs are responsible and act independently in so far as their assigned duty or part of the

maneuver is concerned. *International Terminal Operating Co. v. Naviera Aznar, S. A.*, 198 F. Supp. 214, 217 (S.D.N.Y. 1961) (citing *The Edward G. Murray*, 278 F, 895, 897 (2nd Cir. 1922)).

8. Assisting tugs are liable for their own negligent acts in taking such a wrong positioning with reference to the assisted vessel as to render themselves useless; and thereby cause the collision. *The Edward G. Murray*, 278 F. 895, 897 (2d Cir. 1922).

9. The tug is not liable as an insurer or as a common carrier but owes to the "tow" the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services. *Stall & McDermott v. The Southern Cross*, 196 F.2d 309,311 (5th Cir. 1952).

10. The relationship of assisting tugs and assisted vessel, though contractually based, in terms of the respective liabilities of the parties to one another for loss or damage caused in the course of the execution of the assisted ship maneuvering is governed by principles of negligence (*Posavina Shipping Co. v. Alex C Corp. (In re Alex C Corp.)*, 2010 U.S. Dist. LEXIS 116381 at *24 (D. Mass. Nov. 1, 2010)); and unseaworthiness (*The Enterprise,* 228 F 131, 137 (D. Conn. 1915)).

11. A suit by the owner of a tow against her tug, to recover for an injury to the tow by negligence on the part of the tug, is a suit *ex delicto* and not *ex contractu*. *The John G. Stevens*, 170 U.S. 113, 125 (1898). These principles governed the relationship of the tugs JESS NEWTON and GASPARILLA (collectively the "Tugs") to the AFRAMAX RIVER at all relevant times.

12. "The analysis of a maritime tort is guided by general principles of negligence law. *Casaceli v. Martech Int'l., Inc*., 774 F.2d 1322,1328 (5th Cir.1985); *Daigle v. Point Landing, Inc*., 616 F.2d 825, 827 (5th Cir.1980). Under these principles a tortfeasor is accountable only to those

to whom a duty is owed." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987). The Tugs owned and/or operated by Tug Interests, having undertaken to assist the undocking and backing into the channel maneuver of the AFRAMAX RIVER, had a duty to exercise due care in providing their services.

13. The duty to exercise due care in the circumstances of the undocking and backing into the channel maneuver involved several components. One such obvious component was for the Tugs to communicate before and while undertaking such a maneuver so that they will be coordinated with each other and with the compulsory pilots as what was to be done and what was being done in the course of the maneuver. See e.g., *Houston Fuel Oil Terminal Co. v. M/N City of Akaki*, No. 94-20778, 1996 U.S. App. LEXIS 45250 at *2, *5 (5th Cir. Feb. 23, 1996) (Tug negligent in failing to advise the harbor pilot that the tug could not carry out its orders).

14. An important part of the work to be done by the Tugs in assisting the AFRAMAX RIVER to undock and maneuver into the outbound lane of the Houston Ship Channel was the proper "making up" of the Tugs with reference to the hull of the AFRAMAX RIVER.

15. The positioning of the tug that will assist the vessel is the responsibility of each tug master. If he positions the tug in relation to the vessel assisted at the wrong position and it causes damage to the vessel, the tug is liable. See, *The Edward G. Murray*, 278 F. 895, 897 (2d Cir. 1922).

16. It is not for the master of the vessel or for the pilot to instruct the tug master where is the proper placement of the tug assisting the vessel. *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1453 (E.D. Va. 1996).

17. The owner of the vessel is entitled to rely upon the expertise of a tug captain in docking and undocking maneuvers. *Id.*

18. While the rule in the Fifth Circuit is that the tug master must follow the maneuver orders of the pilot in charge of the navigation of the vessel (*In re Marquette Transportation Co. Gulf Inland, LLC*, 2021 U.S. Dist. LEXIS 238989 at *12(W.D. La. Dec. 14, 2021)), this does not absolve the tug from liability for failing to warn the pilot of the tug's inability to carry out the pilot's orders and give adequate time to the pilot to avoid collision/allision.  *Houston Fuel Oil Terminal Co. v. M/N City of Akaki*, 1996 U.S. App. LEXIS 45250 at **4-5 (5th Cir. 1996); See also, *Chitty v. M/V Valley Voyager*, 408 F.2d 1354, 1357 (5th Cir. 1969).

19. The operator of a tug in rendering its services warrants to the towed vessel the seaworthiness of its tug.  "[I]n in a contract of towage there is an implied obligation that the tug shall be efficient and properly equipped for the service, provided, of course, that the breakdown did not arise from causes which ordinary care could have discovered and prevented." *The Enterprise*, 228 F. 131, 137 (D. Conn. 1915).

20. "In a contract of towage, the towing company undertakes that it possesses sufficient knowledge and skill to perform the contract safely; that it will use its best endeavors, skill and diligence for that purpose; that it will provide a seaworthy towing vessel, properly equipped and manned, and of sufficient capacity and power to perform the task undertaken, under conditions which are to be reasonably anticipated." *River Parishes Co. v. M/V Flag Adrienne*, 2002 U.S. Dist. LEXIS 12232 at *12 (E.D. La. July 1, 2002).

21. A seaworthy vessel is one that is "reasonably fit for its intended use…The focus is on whether the vessel as equipped was reasonably capable of performing the intended mission if properly operated." *Posavina Shipping Co. v. Alex C Corp. (In re Alex C Corp.)*, 2010 U.S. Dist. LEXIS 116381 at *31 (D.MA. 2010) (citing *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 13 (5th Cir. 1976)).

22. "The failure of a tug's machinery or gear is within the class of cases where the facts are peculiarly within the knowledge of the tug owner who must explain the occurrence or be held liable for the resulting damages.  The duty extends not only to disclosing what happened, but what was done to avoid, and what would have been necessary to prevent the failure of the tug's machinery or gear." *River Parishes Co. v. M/V Flag Adrienne*, 2002 U.S. Dist. LEXIS 12232 at * 13(E.D. La. July 1, 2002).

## <u>FAILURE OF THE TUGS TO COMMUNICATE AND<br>COORDINATE WITH PILOTS</u>

23. The Tugs did not have a predeparture meeting or discussion with the pilots as to what they would do in executing the maneuver out of the berth and into the channel.  It was assumed that the Tugs knew what to do.  (McGee PM Session on Feb. 10, 2023 at p. 9:5-16; p. 10:4-18).

24. The Tugs failed to exercise due care in the circumstances of the undocking and backing into the channel maneuver having failed beforehand to have a briefing with the Pilots. It was assumed that the Tugs having performed the same maneuver several times before, and there was no need to coordinate at all in this regard.  (McGee PM Session on Feb. 10, 2023 at p. 9:5-16; p. 10:4-18; Exhibit A 227 (Spyrou) at pp. 11:5-13:21, pp. 22:3-23:2, pp. 33:6-35:5, pp.84:12-86:12, pp. 136:13-137:19, p. 138:9-25, p. 139:8-18).

25. Even when the risk of the allision became a concern during the course of the maneuver,  Mate Arduengo of the JESS NEWTON assumed the maneuver was going to work out and considered that it was not his place to alert Pilot McGee about his concerns about the Vessel's speed or his perceived risk of an allision.   (Tug Exhibit 139; Exhibit A 250; Arduengo PM Session on Feb. 13, 2023 at pp. 43:3-45:16).  Even when his concern was heightened by what he perceived to be an increase in the speed of the AFRAMAX RIVER Mr. Arduengo did not express his concern to the pilot. (Tug Exhibit 139; Exhibit A 250; Arduengo AM Session on Feb. 14, 2023

at pp. 38:15-45:22).  He assumed from the tone of the pilot's voice that the pilot knew there

was a situation.  (Arduengo AM Session on Feb. 14, 2023 at p. 43:2-6).  The first time Mate

Arduengo voiced his concerns to the pilots was when the AFRAMAX RIVER was 50 feet

away from the ITC mooring dolphins. (Tug Exhibit 139; Exhibit A 250; Tug Exhibit 149).

The failure of Mate Arduengo to warn the pilot that the JESS NEWTON was failing to turn

the stern of the AFRAMAX RIVER was negligence that contributed to the occurrence of the

incident.

### THE TUGS NEGLIGENTLY FAILED TO PROPERLY MAKE UP TO THE AFRAMAX RIVER

26. An important part of the work to be done by the tugs in assisting a vessel to undock and

maneuver into the outbound lane of the Houston Ship Channel was the proper "making up" of

the tugs with reference to the hull of the AFRAMAX RIVER.

27. The positioning of a tug in assisting a vessel is the responsibility of the tug master.  If he

positions the tug in relation to the vessel assisted is the wrong position and it causes damage

to the vessel, the tug is liable.   See *The Edward G. Murray*, 278 F. 895, 897 (2d Cir. 1922).

28.  It is not for the master to instruct the tug master where is the proper placement of the tug

assisting the vessel.  *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924

F. Supp. 1436, 1453 (E.D. Va. 1996).  The owner of the vessel is entitled to rely upon the

expertise of a tug captain in docking and undocking maneuvers. *Id.*  In the case before the

Court, the Master of the AFRAMAX RIVER made his express recommendation as to the

proposed placement of the Tugs during the Master-Pilot pre-evolution meeting.   This

recommendation is set out in the Master-Pilot Information Exchange.  (Tug Exhibit 40; JPTO

Stipulation, Doc. 141 at ¶ 49; Kumar PM Session on Feb. 6, 2023 at pp. 48:14-49:25).  The

information exchange showed in words and a drawing the most effective positions for the

placement of the Tugs. For the aft tug, it was at a pair of chocks around Frame No. 9, aft of the Vessel's accommodation on the main deck. (*Id.*).

29. The Master and Mate of the aft-positioned tug, the JESS NEWTON, failed to exercise due care in the circumstances with reference to the chock and bit of the AFRAMAX RIVER where they made up their towing hawser for the purpose of assisting the AFRAMAX RIVER to turn her stern clockwise to enter the outbound lane of the Houston Ship Channel. Tug master Capt. Curry and, subsequently, Mate Arduengo, who was in charge of the JESS NEWTON's navigation at the time of the allision, undertook the towage with the JESS NEWTON's hawser attached a considerable distance forward from the aft port quarter chock where she should have been attached. The position where the towing hawser was actually attached by the JESS NEWTON was considerably forward of the Vessel's accommodation, well ahead from her aft port quarter chock located on the AFRAMAX RIVER's port quarter around Frame 09. The JESS NEWTON's point of attachment was at or ahead of the AFRAMAX RIVER's pivot point. This virtually guaranteed that with the commencement of the backing out maneuver, the pivot point would shift sternward, thus cancelling out, or greatly reducing, the lever that the aft tug might have exerted in order to provide the turning moment needed to effectively turn into the Houston ship channel. (Exhibit A 227 (Spyrou) at pp. 82:24-84:11, pp. 87:24-89:5; Chourdakis AM Session on Feb. 9, 2023 at p. 91:6-15, pp. 94:3-96:9; Chourdakis PM Session on Feb. 9, 2023 at p. 26:13-25; Nichols AM Session on Feb. 15, 2023 at pp. 61:15-64:25).

30. The negligent failure of the JESS NEWTON to attach her hawser at the proper point onboard the AFRAMAX RIVER was one of the principal causes of the inability of this tug to perform the simple task assigned to her - turn the stern of the AFRAMAX RIVER clockwise and into

the channel.  The source of that negligence was the manifest unfamiliarity of the Mate and the Master of the JESS NEWTON of elementary principles of ship handling that any officer in charge of the navigation of a tug should know when called upon to position the tug they command in unberthing a vessel.  Mate Arduengo, when pressed, could not explain the role that a vessel's pivot point plays when a tug is called upon to assist a vessel.  (Arduengo PM Session on Feb. 13, 2023 at pp. 109:17-110:14).  Capt. Curry's rule of thumb in choosing the chock of the vessel where the towing hawser should be attached was to  choose "a chock that's safe and it won't get you into trouble and you tell the pilot and that's where you  make fast." (Curry PM Session on Feb. 10, 2023 at p. 105:8-10).

31. Apart from what is evident negligence on the part of the JESS NEWTON in attaching her hawser through the wrong chock of the AFRAMAX RIVER, the record shows yet another set of reasons why this tug was unable and/or unwilling to attach her hawser at the port quarter chock (situated at approximately Frame 09 on the port side of the AFRAMAX RIVER).  The configuration of the JESS NEWTON was such that she could not have fit under the "counter" of the AFRAMAX RIVER if it became necessary for her to act as a push-tug. On the other hand a tug, configured as the GASPARILLA was, could have been effectively deployed at this position.   In his cross-examination during the trial Mate Arduengo retreated from his deposition testimony which had been that the JESS NEWTON's configuration, her superstructure, prevented her from acting as a push tug if this became necessary in the course of the evolution.  (Arduengo PM Session on Feb. 13, 2023 at pp. 106:23-108:4).  The unsuitability of the JESS NEWTON to attach her towing hawser through a chock that would have allowed her to perform more efficiently made this tug not reasonably fit for her intended use, *i.e.* unseaworthy.

32. The change in the testimony of Mate Arduengo, over that of his discovery deposition, was that the JESS NEWTON would not attach through the chocks over the Vessel's counter because of the proximity of these to the propeller of the AFRAMAX RIVER and her ballast condition. (Arduengo PM Session on Feb. 13, 2023 at pp. 106:23-108:14).

33. On the other hand, the tug GASPARILLA, was by reason of her structure well suited to serve as a push-pull tug if she was attached through the port quarter chocks, and would have provided approximately 1,000 additional horsepower for turning the stern of the AFRAMAX RIVER clockwise.  However, she was incapable of serving as the aft tug on the Vessel's port quarter and aft of the Vessel's accommodation at Frame 09, because her towing winch was out of order. Thus, the GASPARIALLA was unable to control the length and tension of her hawser and she was forced to connect to the Vessel "conventional" as the bow tug instead of the aft tug. By reason of her unseaworthiness in lacking an operable towing winch, the GASPARILLA was incapable of acting as the aft, which would have provided effective assistance to the Vessel.  She was not adequately equipped for the intended service and was, therefore, unseaworthy. (Exhibit A 227 (Spyrou) at pp. 82:24-83:24; Tug Exhibit 211; JPTO Stipulation, Doc. 141 at ¶ 61; Curry AM Session on Feb. 13, 2023 at p. 55:10-25; Arduengo PM Session on Feb. 13, 2023 at p. 108:15-23; Phillips PM Session on Feb. 15, 2023 at pp 32:12-33:2).

34. The Tugs throughout the course of the undocking maneuver, for these reasons, failed to provide the necessary turning moment needed to effectively position the Vessel in the outbound lane of the Houston Ship Channel. The Master of the AFRAMAX RIVER deferred to the expertise of the Tugs regarding the positions at which the Tugs chose to attach on the hull of the AFRAMAX RIVER. (Kumar PM Session on Feb. 6, 2023 at pp. 54:23-55:13.).  The JESS NEWTON chose to attach her towing line through a chock on the main deck of the AFRAMAX

RIVER forward of the accommodation on the Vessel's port side.  (Tug Exhibit 137 at G&H 00125; Tug Exhibit 51; Tug Exhibit 52; Tug Exhibit 212; Exhibit A 325).

35. Tug Interests, through the testimony of some of their witnesses, argued in the course of the trial, that attachment of the JESS NEWTON aft of the accommodation was not possible because of the proximity of that position to the Vessel's propeller. (Arduengo PM Session on Feb. 13, 2023 at pp. 106:23-108:14; Nichols AM Session on Feb. 15, 2023 at pp. 66:20-66:4).

36. However, admiralty courts of the United States, that have considered cases involving the making up of assisting tugs, do not share these views.  For example, in *National Shipping Co. of Saudi Arabia v. Moran Mid-Atlantic Corp*., 924 F. Supp. 1436, 1441 (E.D. Va. 1996), the court noted that making up at the stern quarter of a vessel at the flared area is a place where tugs customarily either push or pull the vessel with a rope.   In *Houston Fuel Oil Terminal Co. v. M/N City of Akaki* 1996 U.S. App. LEXIS 45250 at *2 (5th Cir. Feb. 23, 1996), a G&H operated tug was made up "to the CITY OF AKAKI'S port quarter (stern)". See also, *Grace Line, Inc. v. The C. Hayward Meseck*, 150 F. Supp. 425, 427 (S.D.N.Y. 1957).   Moreover, the case law relating to the issue does not sustain an  argument of complete prohibition of attaching to a point where there might be a risk of coming into contact with the propeller.  Rather, the cases underscore the exercise of caution tugs must exercise when navigating in these circumstances and hold the tug liable for negligent conduct. *Grace Line, Inc. v. The C. Hayward Meseck*, 150 F. Supp. 425, 429 (S.D.N.Y. 1957); See also, *The Olympic*, 221 F. 296 (S.D.N.Y. 1914) (tug assumed the risk of being drawn by the suction of the propeller by going too close to it); See also, *Posavina Shipping Co. v. Alex C Corp*. (In re Alex C Corp.), 2010 U.S. Dist. LEXIS 116381 at fn. 17 (D.Mass. Nov. 1, 2010) (Exhibit A 330 at p. 148, Fig. 67;

Exhibit A 229 (Dadwal) at pp. 22:5-24:13; Chourdakis AM Session on Feb. 9, 2023 at p. 98:4-12; Curry AM Session on Feb. 13, 2023 at pp. 52:2-53:22).

37. The tug master of the JESS NEWTON who made the decision to make up his tug forward of the accommodation of the AFRAMAX RIVER testified that for a tug to be anywhere near where the propeller is, it would need to have a working winch.  The JESS NEWTON could have attached at a chock after the wheelhouse and if it became necessary for her to push forward she could have released a sufficient length of her towing hawser to move ahead away from the counter of the ship and act as a push tug. (Curry AM Session on Feb. 13, 2023 at pp, 52:1-53:1, p. 55:10-25).

38. Accordingly, the relative proximity of the chock in way of Frame 09 to the propeller of the AFRAMAX RIVER that would have allowed the JESS NEWTON greater torque in pulling the stern clockwise had she attached there, was not in itself a good reason for attaching forward of the accommodation.  The alternative of navigating the tug with caution to avoid the propeller was available, and a feasible alternative that would have provided the JESS NEWTON with increased leverage to pull the Vessel's stern up the channel.

39. Capt. Curry's rule of thumb in choosing where to attach the hawser of the JESS NEWTON was to select a "a chock that's safe and it won't get you into trouble and you tell the pilot and that's where you make fast."  (Curry PM Session on Feb. 10, 2023 at p. 105:8-10).   In making his decision not to attach to Frame 09,  Capt. Curry's rationale was "I mean, you could do that; but I mean, it's a normal job. You're backing out into the Channel." (Curry AM Session on Feb. 13, 2023 at p. 53:2-3).   In deciding to make up the JESS NEWTON where he decided was a safe spot, but not one that would have substantially amplified the turning moment required, Capt. Curry acted negligently.

**THE UNSEAWORTHINESS OF THE EQUPMENT OF**
**THE TWO TUGS COMBINED WAS A CONCURRENT PROXIMATE CAUSE OF**
**THE ALLISION**

40. The unseaworthiness of the two tugs combined proximately caused their inability to provide the AFRAMAX RIVER with the steering Tug Interests were required to provide in order to safely turn and position the Vessel in the outbound lane of the Houston Ship Channel.

41. While engaged in providing her services to the AFRAMAX RIVER and in the course of towage, the JESS NEWTON suffered a mechanical breakdown of her towing winch that rendered her incapable of effectively controlling her hawser and effectively assisting the AFRAMAX RIVER to make her turn into the Houston Ship Channel.  It also made her engine room inaccessible for entry because of hydraulic fluid leakage spaying in all directions.  The breakdown purportedly in the direction control valve of the winch rendered the winch ineffective and/or inoperable and the JESS NEWTON unseaworthy, and out of service. (Tug Exhibit 210; Exhibit A 322).  Tug Interests did not make an investigation of the root causes of the mechanical breakdown of the towing winch of the JESS NEWTON and the crew members onboard the JESS NEWTON have provided contradictory accounts as to the time of the occurrence and the sequence of contemporaneous events.  (Huttman PM Session on Feb. 8, 2023 at pp. 31:1-32:25; Tug Exhibit 210; Exhibit A 322; Exhibit A 221; Tug Exhibit 214; Arduengo AM Session on Feb 14, 2023 at pp. 89:7-90:11).

42. The unexplained failure of a tug's machinery in the circumstances gives rise to a presumption of unseaworthiness. See e.g., *River Parishes Co. v. M/V Flag Adrienne*, 2002 U.S. Dist. LEXIS 12232 * 13 (E.D. La. July 1, 2002).

43. Within less than one minute from the occurrence of the allision, the JESS NEWTON was incapable of letting go of her line as ordered by pilot McGee. (Tug Exhibit 139 at G&H 00533;

Exhibit A 275; Tug Exhibit 153; Tug Exhibit 154).  This strongly suggests that there was a leakage of hydraulic oil from the hydraulic system of the winch that had developed in the course of the evolution, rendering the winch ineffective, and manifesting itself when the JESS NEWTON strained her winch and increased the pressure on the hydraulic lines. (Chourdakis AM Session on Feb. 9, 2023 at pp. 101:10-103:17; Chourdakis PM Session on Feb. 9, 2023 at pp. 36:22-38:4).

44. "The failure of a tug's machinery or gear is within the class of cases where the facts are peculiarly within the knowledge of the tug owner who must explain the occurrence or be held liable for the resulting damages…The duty extends not only to disclosing what happened, but what was done to avoid, and what would have been necessary to prevent the failure of the tug's machinery or gear."  *River Parishes Co. v. M/V Flag Adrienne*, 2002 U.S. Dist. LEXIS 12232 at *13 (E.D. La. July 1, 2002).

45. Tug Interests having failed to explain the occurrence of the JESS NEWTON's towing winch mechanical breakdown gives rise to a presumption of unseaworthiness of this vital item of the equipment of the tug.

46. The near-contemporaneous documentary evidence generated by Tug Interests in the form of incident reports of the crew, and contemporaneous electronic video recordings, bear out and strongly support the inference of a causal relationship of the mechanical breakdown of the towing winch and the consequent failure of the JESS NEWTON to generate the necessary turning moment needed to rotate the stern of the AFRAMAX RIVER clockwise.

47. The unseaworthiness of the JESS NEWTON's towing winch that manifested itself in the course of the towage was a concurrent proximate cause of the allision.

## THE FAILURE OF THE TUGS TO FOLLOW THE PILOTS' ORDERS WAS A CONCURRENT CAUSE OF THE ALLISION INCIDENT

48. Assist tugs have a duty to "promptly execute the orders of the tow's commander or here, the person in charge of the [piloted vessel]." *Bisso v. Waterways Transp. Co.*, 235 F.2d 741, 746 (5th Cir. 1956).  "Chaos would indeed prevail if a helper tug either did, or felt under compulsion to determine, what that tug from its limited point of view thought ought to be done." *Bisso*, 235 F.2d at 746 (citing *Moran Towing & Transportation Co. v. Empresa, Hondurena de Vapores*, 31 F.2d 963 (5th Cir. 1929)).

49. Moreover, "Tugs, when taking other vessels in tow, are bound to use ordinary care and diligence in taking up and managing the tow according to the exigencies of the business. They have the full government and care of the vessel towed. *The Quickstep*, 9 Wall. 670. They cannot abandon the safety of interests intrusted to them for slight causes, or on account of even ordinary obstacles, and excuse themselves. The causes must be ample, and the obstacles in the way of performance must be at least of an extraordinary character, if not absolutely insurmountable." *The W. J. Keyser*, 56 F. 731, 734 (5th Cir. 1893); see also, *The Joseph F. Clinton*, 250 F. 977,979 (2d Cir. 1918) ("[A] tug is bound by the contract of towage not to abandon both tow and contract when the former gets into trouble, until the reasonable resources of good seamanship are exhausted.  The tug's engagement is usually, as here, to take the tow from one place to another in a skillful manner…and when danger arises, the tow cannot be abandoned until all reasonable efforts for its preservation have been exhausted")).

50. The failure of the JESS NEWTON to obey the pilots orders to "come ahead" on the AFRAMAX RIVER and, indeed, the out and out refusal of Mate Arduengo who was in charge of her navigation to obey the pilot's order (*"I can't come ahead on it now"* and "All right, I am out") was the last opportunity the AFRAMAX RIVER had to avert contact with the ITC

mooring dolphins, and as such, it is chargeable to the JESS NEWTON as a substantial cause of the allision.  This is so, not only because the JESS NEWTON was required to obey the pilot's orders and not take action on his own, but also because Tug Interests - acting by its employee Mate Arduengo - abandoned the AFRAMAX RIVER and did not even make an attempt to push her port quarter away from the ITC mooring dolphins that punctured her hull and bunker tank.  These events are not based merely on the personal perceptions of the witnesses to the events.  They were recorded in electronic form of the on-the-air transmissions on VHF Channel 14, and electronic records such as the Vessel's ECDIS and the Pilot's PPU. The trier of fact can see in real time the movements and position of the Vessel, the Tugs and mooring dolphins. (Tug Exhibit 139; Exhibit A 250; Tug Exhibit 150; Tug Exhibit 205).

51. These acts and omissions of the JESS NEWTON amounted to an abandonment of the AFRAMAX RIVER by the tug responsible for its steering.  The law does not let off lightly a tug that abandons its tow. *The W. J. Keyser*, 56 F. 731, 734 (5th Cir. 1893); *The Joseph F. Clinton*, 250 F. 977, 979 (2d Cir. 1918).   In disobeying the pilot's orders, Mate Arduengo, in his own words, chose to keep his job, protect his crew, and protect his vessel. (Arduengo AM Session on Feb. 14, 2023 at pp. 83:18-84:9).

52. The abandonment of the AFRAMAX RIVER by the JESS NEWTON at a very critical, last opportunity to prevent the allision, was not the only instance in which the Tugs involved in this maneuver disobeyed the pilot's orders.  The GASPARILLA also when ordered to push the AFRAMAX RIVER at 00:03:51 did not actually execute the order until 00:04:50. (Tug Exhibit 205; Tug Exhibit 139; Tug Exhibit 51; McGee PM Session on Feb. 10, 2023 at pp. 51:14-53:7; Nichols AM Session on Feb. 15, 2023 at p. 75:2-8).   Indeed, from all shore-side video

recordings, but also from the PPU itself, it appears that the Tugs were merely sailing alongside the AFRAMAX RIVER, making little effort to turn her.

### THE TUGS, HAVING PUT THE AFRAMAX RIVER IN A POSITION OF PERIL WERE UNDER A DUTY TO ASSIST WITH FIREFIGHTING

53. Equally disengaged were the assisting tugs when it comes to rendering assistance to extinguish the fire that resulted from the allision. The Tugs have taken the position that they did not have any duty to provide firefighting to the AFRAMAX RIVER following the allision.

54. The record at trial bears out that the JESS NEWTON had a fire monitor, but that it was not used. (Huttman PM Session on Feb. 8, 2023 at p. 76:9-16; Huttman AM Session on Feb. 9, 2023 at p. 22:5-19, p. 25:1-5, pp. 33:24-34:23; Arduengo PM Session on Feb. 13, 2023 at p. 68:12-13). Similarly, the GASPARILLA, in spite of being classed by ABS as a Class 1 firefighting tugboat, had two inoperative forward fire monitors. (Huttman PM Session on Feb. 8, 2023 at p. 79:10-13, at pp. 87:7-90:4).

55. These conditions onboard both assisting tugs were textbook instances of unseaworthiness. Both tugs were equipped with firefighting equipment that were not in good working order.

56. Tug Interests have taken the position that they have no liability for failing to engage in firefighting following the allision as they had no legal duty to do so. (*See* Tug Interests' Closing Argument, PM Session on Feb. 15, 2023 at p. 48:1-5, pp. 48:22-49:11). "The assessment of responsibility as between tug and tow for damages caused by negligent towage is made on the following basis: 'These cases of tow against tug are, in form and fact, very much like collision cases. The contract gives rise to duties very closely resembling those which one vessel owes to others which it may meet. There is, therefore, an analogy between the two classes of cases so close that the tow may sue, in one proceeding for damage, her own tug and a strange vessel with which there has been a collision.'" *The John G. Stevens,* 270 U.S. 113, 124 (1898)

(quoting *The Arturo*, 6 F. 308, 1881 U.S. App. LEXIS 1918)).  Accordingly, courts look at the

principles that apply to collision cases in assessing the responsibilities between tugs and tows.

In the case of the *Clarita*, 90 U.S. (23 Wall.) 1, 18 (1874), the Supreme Court defined the

duties of a tug operator who was operating as a professional salvor as follows:

> Where two vessels come in collision, <u>if one is not disabled she is bound to render</u>
> <u>all possible assistance to the other, even though the other may be wholly in fault</u>.
> Authorities to support that proposition are quite numerous, and it is very clear
> that if the vessel in fault renders assistance to the one not in fault, the former
> cannot make any claim for salvage either from the other vessel or the cargo on
> board, as it is her duty to render every assistance in her power. Services of the
> kind, when required by duty, do not constitute a claim for salvage, and it is
> expressly decided that salvors are not entitled to reward for saving property which
> they had by their own wrongful acts contributed to place in jeopardy, and the
> court here fully concurs in that proposition.

In the case at hand, the Tugs, having put the AFRAMAX RIVER in a position of peril, were

required to render all possible assistance to her.  If their unseaworthiness prevented them from

rendering assistance, the fault and liability rests on them.

## APPORTIONMENT OF LIABILITY

57. "Comparative fault is used to apportion liability in maritime cases when two or more parties

have contributed by their fault to cause property damage in a maritime collision or stranding."

*U.S. v. Reliable Transfer Co*., 421 U.S. 397, 411, 95 S. Ct. 1708, 44 L. Ed. 2d 251 (1975).

"[L]iability for such damage is to be allocated among the parties proportionately to the

comparative degree of their fault…." *Id.* Further, the United States Court of Appeals for the

Fifth Circuit recognized that "the Supreme Court abandoned the archaic concept of tort

indemnity and replaced it with the doctrine of comparative fault." *Pierce v. Five B's, Inc.*, 2008

U.S. Dist. LEXIS 65530 at *4 (E.D. La. Aug. 27, 2008).

58. "[W]hen two or more parties have contributed by their fault to cause property damage in a

maritime collision or stranding, the Supreme Court has instructed liability for such damage is

to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *Impala Terminals Burnside LLC v. Marquette Transportation Co*., 2021 U.S. Dist. LEXIS 55579 *11 (E.D. La. Mar. 24, 2021)  (*quoting United States v. Reliable Transfer Co., Inc*., 421 U.S. 397, 411, 95 S. Ct. 1708, 44 L. Ed. 2d 251 (1975).)

## **DAMAGES – COST OF REPAIRS**

59. "Strictly the measure of damages in collision is the difference in value between the ship before and after the collision, but the cost of the necessary repairs and the loss of earnings while they are being made have long been regarded as its equivalent. As to the loss of earnings, it may be that the owner makes a prima facie case when he proves his actual loss by reason of the lay-up.' And the rule as stated by this Court  is this: 'The maxim 'Restitutio in integrum,' applies in awarding damages in collision cases, and there is no doubt that the owner of a vessel may recover as damages an amount necessary to restore her to her condition before the accident, whether the repairs are actually made or not, if the value of the vessel is thereby decreased." *Miami v. Western Shipping & Trading Co*., 232 F.2d 847, 851 (5th Cir. 1956).

60. The owner of a vessel damaged as a result of collision is entitled to make the repairs that are immediately necessary and these are properly recoverable. *Cape Bille Shipping Co. v. Tug Judy Moran,* 2007 U.S. Dist. LEXIS 74671*29 (S.D.N.Y. Aug. 22, 2007).  An "owner's reasonable and good faith decision to make immediate repairs is generally determinative of the issue as to whether repairs were necessary." *Id.*

61. In the case of the AFRAMAX RIVER, ARM had no choice but to make the repairs and other replacements for the restoration of the vessel as these were class conditions on the further trading of the Vessel.

62. In deciding whether the cost of repairs to the damaged vessel are reasonable the court "will allow the injured party a wide latitude in determining how best to deal with the situation." *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 933 (5th Cir. 1979).  In any event "[t]he burden of showing that the victim of tortious conduct failed to minimize his damages rests with the wrongdoer."

63. There is no evidence that has been put forth by Tug Interests showing that the cost of repairs, associated expenses, and other costs incurred in restoring the AFRAMAX RIVER to the status of a tanker vessel capable of trading was not reasonable.

64. "Maritime law permits parties to recover money damages resulting from a collision caused by the negligence of another party. Damages include the cost of vessel repair, loss of use, out-of-pocket costs of wreckage and cargo removal, salvage, drydocking, and caring for the damaged vessel" *Kirby Inland Marine v. FPG Shipholding Co.,* 548 F. Supp. 3d 613, 626 (S.D. Tex. 2021).  Pollution response damages incurred by the owners of the damaged vessel are also recoverable from the party at fault.

## DAMAGES – LOST PROFITS

65. "That the loss of profits or of the use of a vessel pending repairs or other detention, arising from a collision, or other maritime tort, and commonly spoken of as demurrage, is a proper element of damage, is too well settled both in England and America to be open to question." *The Conqueror*, 166 U.S. 110, 125 (1897*); Graham v. PCL Civil Constructors, Inc*., 2013 U.S. Dist. LEXIS 179688 at * 14-15 (S.D. Tex. Dec. 23, 2013).

66. Lost profits during a repair period can be determined by "a simple calculation based upon the number of days the [vessel] was out of service . . . multiplied by the average daily lost profits for the vessel. From this gross figure must be subtracted the ordinary expenses the shipowner would incur in operating his vessel to ascertain the owner's net profit." *Graham v. PCL Civil Constructors, Inc*., 2013 U.S. Dist. LEXIS 179688 * 15(S.D. Tex. Dec. 23, 2013).

67. If, in conducting repairs, a vessel is laid up and she does not incur such running costs as crew wages, victualing, fresh water and bunkers consumption, such costs may be deducted from the recovery of damages for lost profits.  However, if such costs have continued to be incurred by the owners during the repair period, they may not be deducted from damages.  *Skou v. United States*, 478 F.2d 343, 357-348 (5th Cir. 1973)**.**

68. From the time of the allision incident, through completion of repairs and restoration of the AFRAMAX RIVER to class, the Vessel maintained onboard a full crew and consumed bunkers. These costs, accordingly, may not be deducted from damages.

69. ARM has made a claim for lost profits during the Vessel's repair period that shows the Vessel had been employed steadily since 2012 in the Navig8 V8 Pool.

70. The earnings of the AFRAMAX RIVER's owners at the time of the allision, and for the foreseeable future, was their share from the Vessel's participation in the Navig8 V8-Aframax Pool, which is a revenue sharing pool of vessels to which ARM had participated since 2012.

71.  "A tanker pool is a collection of tanker vessels under various ownership, which are placed under the care of a single administrator, known as a pool manager. The pool manager markets the vessels in the tanker pool to those companies interested in hiring vessels to carry cargo, facilitating the employment of each vessel. A pooling agreement is a contract between shipowners or others having rights in vessels to cooperate in the management and operation of

all vessels controlled by the group whereby each ship earns from the pool a share in net pool income proportionately with the ship's agreed theoretical earning capacity, as opposed to its actual earnings in the pool.  Black's Law Dictionary 1348 (10th ed. 2014). It is essentially the contract used to set up a tanker pool. It typically covers issues such as the objective of the pooling agreement, the authority of the pool managers, the capacity in which the pool managers will act, and the means by which the pool manager will be paid." *United States v. CITGO Asphalt Ref. Co. (In re Frescati Shipping Co.)*, No. 05-cv-305 (JHS), 2016 U.S. Dist. LEXIS 96761 at fn 33 (E.D. Pa. July 25, 2016).

72. A condition of the participation of the AFRAMAX RIVER in the Navig8 V-8 Aframax Pool was her maintaining her approval by at least 3 major oil companies. *See Cape Bille Shipping Co. v. Tug Judy Moran,* 2007 U.S. Dist. LEXIS 74671 at * 20-21 (S.D.N.Y. Aug. 22, 2007).

73. In response to reports of the allision, all major oil companies' approvals of the AFRAMAX RIVER were terminated.  Thus, the Vessel was no longer in the pool.  Accordingly, for the next three voyages from October 3, 2016 to December 29, 2016, the Vessel pursued employment outside the V8 Pool in order to mitigate its losses while endeavoring to re-enter the V8 Pool by obtaining the major oil companies' approval.  These endeavors to obtain approval by at least three major oil companies were to no avail.

74. The AFRAMAX RIVER earnings from trading, following completion of repairs between October 3, 2016 through December 29, 2016 resulted in a net loss of USD 414,799.50, based on the daily payment the Vessel would have earned under the V8 Pool of USD 17,197.00 during these dates, expressed as a time charter equivalent.

75. To mitigate its losses, ARM found alternative employment for the Vessel which, for the remaining year 2016 yielded the following profits/losses: (i) Time charter party with AET,

Inc., Ltd. October 12, 2016 – October 16, 2016. Basis the USD 17,197.00 pool income the Vessel would have realized if her employment with the pool had continued, and noting the daily hire rate of the October 12, 2016 charter, the Vessel realized from this employment a net loss of USD 22,240.67 as tabulated in Dkt. 206-4 and supported by documents in Dkt. 206-6; (Dkt. 206-1 at pp. 25:12-29:1);  (ii) Voyage charter party with CITGO dated October 16, 2016 from October 23 through November 13, 2016.  Basis the daily pool income of the V8 Pool of USD 17,197.00 and the time charter equivalent for this fixture of USD 14,840.88 per day, the result was a loss of $65,451.10 as tabulated in Dkt. 206-4 and documented in Dkt. 206-7; (iii) Voyage charter party with Valero dated November 13, 2016 performed from November 25, 2016 through December 29, 2016.  Basis the daily pool income of the V8 Pool of USD 17,197.00 and the time charter equivalent for this fixture, and a time charter equivalent of USD 10,156.75, the result was a loss of USD 327,107.73, as tabulated in Dkt .206-4 and documented in Dkt. 206-8. (Dkt. 206-1 at pp. 36:12-40:25).

76. The lost profits from idleness of the vessel from the time of the incident through the completion of repairs together with the loss of income over the remaining year as a result of loss of approval by the major oil companies and consequent inability to participate in the V8 pool is a total of USD 1,174,632.46. (Exhibit A 318 at p. 43:3-7).

77. The total  amount of losses claimed by Third Party Plaintiff, exclusive of interest, is USD 1,735,990.17 + 1,174,632.46 = USD 2,910,622.63.

## INTEREST

78. "Pursuant to 28 U.S.C. § 1961, a district court is authorized to award pre-judgment interest upon any recovery of monetary damages. In this Circuit, there is a strong presumption in favor of awarding pre-judgment interest in admiralty cases, and interest generally should only be

denied when the plaintiff delays unreasonably in bringing suit…This rate is generally a fixed rate within the discretion of the Court, running from the date of the loss." *Blackwell v. Mid-Stream Fuel Svc*, 2006 U.S. Dist. LEXIS 3387 at * 14-15(E.D. La. Jan. 30, 2006) (citing *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986) (3% pre-judgment interest awarded);  *N.D. Shipping, S.A. v. Zagora M/V*, 2009 U.S. Dist. LEXIS 47538 *25-26 (E.D. La. June 5, 2009)).

Respectfully submitted,

GAITAS & CHALOS, P.C.

/s/Jonathan M. Chalos
George A. Gaitas
Texas State Bar No. 2405885
Federal Bar No. 705176
Jonathan M. Chalos
State Bar No. 24097482
Federal Bar No. 3008683
1980 N Memorial Way
Houston, Texas 77057
Tel: (281) 501-1800
Fax: (832) 962-8178
gaitas@gkclaw.com
chalos@gkclaw.com

*Counsel for Vessel Interests*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 28, 2023, a copy of the foregoing was served on all counsel and/or parties of record through the Court's cm/ecf system.

/s/Jonathan M. Chalos

Jonathan M. Chalos
